937 F.2d 899
 60 USLW 2057, 21 Fed.R.Serv.3d 121, RICO
Bus.Disp.Guide 7788,
33 Fed. R. Evid. Serv. 1233
 Frank and Seba GENTY
and
Jamie and Frank Genty, Jr., infants, by their parents and
natural guardians, Frank and Seba Genty, Appellants,
v.
RESOLUTION TRUST CORPORATION, Receiver of City Federal
Savings Bank (successor in interest to City Federal Savings
and Loan Association; Diamond Crest Inc.; Anna Oliveri;
Vicky Gonzales; Realty Abstract Company; Estate of Thomas
Oliveri; Township of Gloucester; and Estate of James Joyce.
 No. 90-5521.
 United States Court of Appeals,
Third Circuit.
 Argued April 9, 1991.
Decided July 8, 1991.
 
 Rogert J. Sugarman (argued), Sugarman & Associates, Philadelphia, Pa., for appellants.
 Ann S. Duross, Asst. Gen. Counsel, Colleen B. Bombardier, Sr. Counsel, Maria Beatrice Valdez, Counsel (argued), Resolution Trust Corp., Washington, D.C., for Victoria Gonzalez and Resolution Trust Corp. as Receiver for City Federal Sav. & Loan Assn.; Thomas W. Sweet, Sweet & Connelly, Clinton, N.J., of counsel.
 Robert V. Paschon (argued), Paschon and Feurey, Toms River, N.J., for Township of Gloucester.
 Kevin M. Hart (argued), Stark & Stark, Princeton, N.J., for Yei-Shong Shieh.
 Before STAPLETON, COWEN, and ROSENN, Circuit Judges
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 The major question in this appeal, a matter of first impression in this court, is whether civil liability under the Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. Secs. 1961-1968, can be imposed on a municipality for the predicate acts of its officers or agents. The plaintiffs, who purchased property in a development near a toxic landfill, in 1983 brought suit in the United States Court for the District of New Jersey, alleging that a developer and mortgage lender conspired with Gloucester Township, which owned the land leased as a landfill, to promote fraudulently the sale of property despite their knowledge of the landfill's toxic nature. The plaintiffs asserted liability against the defendants under RICO, 42 U.S.C. Sec. 1983, and state common law fraud.
 
 
 2
 In 1984, the district court dismissed the RICO claims against the Township as untimely, based on its application of a two-year limitations period to RICO actions. Following the holding of the United States Supreme Court in 1987 that a uniform four-year limitations period applied to RICO actions, the RICO claims against the Township were reinstated. Prior to the reinstatement of the claims against the Township, the remaining parties tried their case to a jury in 1986. The district court granted a directed verdict in favor of the mortgage lender and several other defendants.
 
 
 3
 The jury returned a verdict of $3,000 for the plaintiffs against the principal developers. The district court entered final judgment on plaintiffs' RICO claims in favor of the Township, ruling that "a municipality cannot form the requisite mental state to commit an act of racketeering activity." The trial court also ruled that personal injuries were not compensable under RICO and that a two-year limitations period barred the plaintiffs' 42 U.S.C. Sec. 1983 claims. The plaintiffs challenge these holdings and also maintain that the district court erred during trial in excluding the testimony of two of the plaintiffs' proposed expert witnesses and in directing a verdict for all the remaining defendants except the principal developers. We affirm.[1]
 
 I. THE BACKGROUND
 
 4
 The plaintiffs purchased property near a municipal landfill in Gloucester Township, Camden County, New Jersey between 1978 and 1982. The district court consolidated the several homeowners suits for trial; only the Gentys, however, filed this appeal. The primary defendants include the developers of the land near the dump, Diamond Crest, Inc., and its principals, Thomas and Anna Oliveri; the mortgage lender which arranged financing for some prospective purchasers of the lots, City Federal Savings and Loan (City Federal); Victoria Gonzalez, an officer at City Federal; the Township of Gloucester, owner of the land leased as a landfill; and James Joyce, deceased, the Township Committee Chairman. However, Gloucester Environmental Management Services, Inc. (GEMS), the operator of the landfill which leased the property from the Township, is not a defendant.
 
 
 5
 With a construction loan from City Federal in 1979 and the permission of Gloucester Township, the developer Diamond Crest and the Oliveris commenced building houses on land known as Briar Lake tract in the Township located near the GEMS landfill. The Gentys, on March 24, 1981, with a $7,000 down payment, entered into a contract with Diamond Crest for the purchase of a home at Briar Lake. The Gentys moved into their new home on July 4, 1981, about a quarter mile from the dump and shortly thereafter received a mortgage commitment from City Federal. They never received title to the property, however, because in October 1981, Diamond Crest filed a petition in bankruptcy, the mortgage commitment expired, and the Gentys never closed on their house. Moreover, they failed to obtain a certificate of occupancy for the property from the Township.
 
 
 6
 The essence of the Gentys' complaint is that the defendants failed to warn the Gentys about known dangers associated with living near the allegedly toxic landfill ("GEMS landfill") and, in the case of some defendants, fraudulently assured the Gentys that the landfill posed no serious harm. The Gentys allege that the defendants used the mail in furtherance of their fraudulent scheme in violation of 18 U.S.C. Sec. 1341.
 
 
 7
 In September 1981, the Gentys allege that they first discovered for themselves the hazardous nature of the GEMS landfill when a neighbor informed them that the federal government had "redlined" an area around the landfill because it was toxic and hazardous to area homeowners. In 1982, the Gentys noticed foul smells emanating from the dump; they remained, however, at the Briar Lake house until September 1983.
 
 
 8
 On October 13, 1983, the plaintiffs filed a complaint in federal court based on real estate fraud alleging RICO violations, civil rights infringement, and various pendent state law claims. Thereafter, the plaintiffs filed a second round of suits against the generators and transporters of the toxic waste deposited at the GEMS landfill. In an opinion and order dated November 1, 1985, the district court divided the suit into two phases. The court stayed the Phase Two suits against the waste generators and transporters until disposition of the Phase One real estate fraud suits.
 
 
 9
 This Phase One suit was tried in April 1986. The trial court previously had dismissed the RICO claims against the Township as untimely believing that a two-year limitations period governed. The court also dismissed the 42 U.S.C. Sec. 1983 civil rights claims as time-barred. The plaintiffs on February 7, 1986, entered a stipulation dismissing the remaining non-RICO claims against the Township.
 
 
 10
 At trial, the district court excluded the proposed testimony of two of the plaintiffs' expert witnesses, and at the close of the plaintiffs' case, the court entered a directed verdict for all the remaining defendants except the developer's principals, the Oliveris. After the trial, the United States Supreme Court held that the uniform limitations period for RICO actions is four years. Agency Holding Corp. v. Malley-Duff & Assoc., 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). This ruling forced the vacatur of the original dismissal of Gloucester Township. The Township is thus the only non-settling party remaining in the Phase One suit.
 
 
 11
 This court dismissed without prejudice the Gentys' original appeal from the 1986 trial because the defendant Diamond Crest, which had filed a petition in bankruptcy, did not participate at trial. Therefore, we have not reviewed until now the trial court's 1986 evidentiary rulings which the Gentys allege were erroneous. In a related RICO action against the Township, the district court dismissed the homeowners' claims because "a municipality cannot form the requisite mental state to commit an act of racketeering activity." Albanese et al. v. City Federal Savings and Loan et al., 710 F.Supp. 563, 569 (D.N.J.1989).
 
 
 12
 To achieve finality for the instant appeal, the parties and the district court took several procedural steps. The district court applied its holding in Albanese and, on the plaintiffs' motion, entered a final judgment for the Township under Fed.R.Civ.P. 54(b). Genty v. Township of Gloucester, 736 F.Supp. 1322, 1330 (D.N.J.1990). The court also entered final judgment on the Gentys' non-RICO claims against the Township, in accordance with the parties' 1986 stipulation of dismissal. Id. Finally, the plaintiffs voluntarily dismissed their claims against Diamond Crest, the defendant absent from the 1986 trial, and the district court approved the dismissal.
 
 II. RULE 54(b) CERTIFICATION
 
 13
 The threshold question before us is whether this court has jurisdiction to hear this appeal. Arising out of ongoing litigation involving multiple claims and multiple parties, this appeal comes to us through the district court's entry of final judgment pursuant to Fed.R.Civ.P. 54(b). That Rule allows a district court to enter final judgment as to fewer than all of the claims or parties so long as the court makes an express determination that there is no just cause for delay.[2] To qualify for Rule 54(b) certification, an order must constitute a "final judgment"; that is, "[i]t must be a 'judgment' in the sense that it is a decision upon a cognizable claim for relief, and it must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.' " Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 7, 100 S.Ct. 1460, 1464, 64 L.Ed.2d 1 (1980) (quoting Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956)). Such finality is measured by the traditional standards governing 28 U.S.C. Sec. 1291; Rule 54(b) simply provides for the appealability of final orders on separable individual claims in ongoing multiple claim or party litigation. Matter of Wood and Locker, Inc., 868 F.2d 139, 144-45 (5th Cir.1989).
 
 
 14
 We must assure ourselves that the trial court's order was correct because proper certification is an essential prerequisite for appellate jurisdiction. Matter of Good Deal Supermarkets, Inc., 528 F.2d 710, 712 (3rd Cir.1975). Without Rule 54(b) certification, this court would have no appellate jurisdiction over Gloucester Township, which remains a viable defendant on different claims in the Phase Two portion of this lawsuit. The district court's discretionary decision to certify "should be given substantial deference." Curtiss-Wright, 446 U.S. at 10, 100 S.Ct. at 1466. This decision, however, must be accompanied by a statement of reasons explaining the court's conclusion. Metro Transp. Co. v. North Star Reinsurance Co., 912 F.2d 672, 677 (3rd Cir.1990); Cemar, Inc. v. Nissan Motor Corp. in U.S.A., 897 F.2d 120, 123 (3rd Cir.1990).
 
 
 15
 Pursuant to the plaintiffs' motion, the district court in its Order of May 10, 1990, entered final judgment under Rule 54(b) on all the Gentys' non-RICO real estate fraud claims against the Township.[3] Genty, 736 F.Supp. at 1330. There are no other defendants left in the Phase One real estate fraud suit. The Township remains as a defendant in the ongoing Phase Two suits based on the alleged ownership, management, and operation of the GEMS landfill under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and RICO.
 
 
 16
 In accordance with Rule 54(b), the district court expressly determined that there was no just cause for delay and stated reasons for its conclusion. The court found that there had already been a substantial delay in the resolution of the Gentys' real estate fraud claims, that the Genty Phase One trial is complete as to all remaining claims and parties, that certification pursuant to 28 U.S.C. Sec. 1292(b) would not permit review of many of the court's evidentiary rulings made at trial, that review by this court now would guide disposition of similar issues in the remaining homeowner real estate fraud suits, that review of the municipal immunity determination will aid in the resolution of Phase Two of the homeowner suits, and that review here will spur progress in the ongoing complex GEMS landfill litigation in the district court because "progress in one case helps to prod the others forward." Genty, 736 F.Supp. at 1329-30.
 
 
 17
 We conclude that the district court did not abuse its discretion in entering final judgment pursuant to Rule 54(b). The court's order was proper because it constitutes a final judgment on a separable individual claim in the context of multiple claim/party litigation. The Phase One and Phase Two claims against the Township are two separable claims in that they invoke different theories of liability for recovery, real estate fraud and environmental mismanagement. See Allegheny County Sanitary Authority v. EPA, 732 F.2d 1167, 1172 (3rd Cir.1984). Although the plaintiffs in both phases of the lawsuit are the same, the defendants are entirely different parties, except for the Township which is a defendant in both phases.
 
 
 18
 The court's order certifying a final judgment fully adjudicated all rights and liabilities concerning Gloucester Township arising out of the real estate fraud claims. Nothing remains to be done in Phase One of the Gentys' suit. Although the Gentys' suit had been previously consolidated with other homeowner suits, a judgment in one of the consolidated claims is certifiable under Rule 54(b) even though other consolidated claims may be pending. Bergman v. City of Atlantic City, 860 F.2d 560, 567, n. 12 (3rd Cir.1988).
 
 
 19
 Furthermore, no party has identified any prejudice resulting from hearing this appeal at this time. Delay in disposition of the Gentys' claims would advance neither the interests of the parties nor of this court. Indeed, the separability of the issues presented herein from the ongoing litigation assures us that there is no danger that this court would have to decide these issues more than once. We therefore have jurisdiction over this appeal.
 
 III. RICO LIABILITY OF MUNICIPAL CORPORATIONS
 
 20
 Turning to the most serious issue in this appeal, we must decide whether or not the district court erred in dismissing the Gentys' RICO claims against the Township. The plaintiffs allege that Gloucester through its officials participated in the alleged fraudulent scheme to induce plaintiffs to purchase homes near the GEMS landfill, with knowledge of the landfill's toxicity. In their complaint, the Gentys state that the Township
 
 
 21
 has at all relevant times been a "person" which acting through its officials and agents ... has invested in itself as an "enterprise" proceeds (in the form of increased tax revenues and otherwise) of the fraudulent sales of hazardous homes, derived in part through the racketeering activities of itself and other participants in the collective enterprise.
 
 
 22
 The crux of the Township's alleged participation in the racketeering activities consisted of its officials' false assurances to home buyers that the GEMS landfill was innocuous and their alleged improper issuance of permits for development of the Briar Lake tract. The Gentys alleged that the Township received over $200,000 in the form of increased tax revenues and permit fees from the Briar Lake development. Because the trial court dismissed the action against the Township before trial, the Township did not defend at trial.
 
 
 23
 Briefly stated, RICO provides for liability in civil suits brought by any person injured "in his business or property" by a RICO violation, with a compulsory award of treble damages, costs, and attorneys fees. 18 U.S.C. Sec. 1964(c). RICO makes it unlawful for "any person" who is employed by or associated with "any enterprise" affecting interstate commerce to "participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. Sec. 1962(c).
 
 
 24
 RICO also prohibits any person who receives income derived from a pattern of racketeering in which that person participated, either by committing the predicate acts or aiding and abetting them, from using or investing the proceeds of such income in the operation of any enterprise affecting interstate commerce. 18 U.S.C. Sec. 1962(a); 18 U.S.C. Sec. 2. Imposition of civil RICO liability thus requires the existence of a "person" engaged in racketeering as well as an "enterprise" through which the illegal conduct occurs. An enterprise may be a public entity, like Gloucester Township. United States v. Frumento, 563 F.2d 1083, 1090 (3rd Cir.1977), cert. denied, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978). The statute defines "persons" broadly to include "any individual or entity capable of holding a legal or beneficial interest in property," section 1961(3), including a corporate entity.
 
 
 25
 Examples of racketeering activity (referred to as predicate offenses) include state felonies punishable by imprisonment of more than a year such as murder, kidnaping, gambling or extortion, as well as more than thirty federal crimes, such as drug offenses, obstruction of justice, obscenity, and mail, wire, bankruptcy, and securities fraud. 18 U.S.C. Sec. 1961(1). A "pattern" of racketeering requires within a ten-year period the commission of at least two predicate acts bearing the indicia of "relatedness" and "continuity." 18 U.S.C. Sec. 1961(5); H.J. Inc., et al. v. Northwestern Bell Telephone Co., et al., 492 U.S. 229, 239-43, 109 S.Ct. 2893, 2900-02, 106 L.Ed.2d 195 (1989).
 
 
 26
 Where, as here, a corporate "person" is also the "enterprise" through which the alleged racketeering activity occurred, liability can arise only under sections 1962(a) or (b). Petro-Tech, Inc. v. Western Co. of North America, 824 F.2d 1349, 1360-61 (3rd Cir.1987) (section 1962(a)); Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1307 (7th Cir.1987), cert. denied, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989) (sections 1962(a) & (b)); see also Smith & Reed, Civil Rico, p 3.07 at 3-58 et seq. (1990) and cases cited therein. This is so because subsections (c) and (d) require that the "persons" liable and the "enterprise" be distinct entities. B.F. Hirsch v. Enright Refining Co., Inc., 751 F.2d 628, 634 (3rd Cir.1984). Sections 1962(a) and (b), on the other hand, do not require such separate identity. To be liable under subsection (a), a corporation-enterprise must be the direct or indirect beneficiary of the racketeering activity carried on by the corporate entity's high officials. Petro-Tech, 824 F.2d at 1361; Haroco v. American National Bank and Trust Co., 747 F.2d 384, 402 (7th Cir.1984).
 
 
 27
 Here, the Gentys included in their complaint the charge that Gloucester Township through its officials violated RICO sections 1962(a), (c), and (d) by its receipt and use of the racketeering-derived proceeds, by its predicate acts of bribery and mail fraud, and by conspiring with the lender and developer defendants to violate RICO. The district court, however, dismissed the civil RICO claim against the Township because, in a related case, the court held that municipalities are immune from civil liability under sections 1962(a), (c), (d) of the RICO statute because a municipality is not capable of forming the criminal intent necessary to commit any of the predicate acts of racketeering identified in section 1961(1). See Albanese v. City Federal Savings and Loan Ass'n, 710 F.Supp. 563, 565 (D.N.J.1989).
 
 
 28
 In the first instance, the Gentys argue that the district court erroneously dismissed the section 1962(a) claim against the Township for its incapacity to formulate the requisite mens rea because no intent or knowledge is required under this section. They contend that section 1962(a) penalizes the receipt and investment of racketeering income in an enterprise without regard to whether or not the persons liable participated in or even knew about the illegal activity which generated the invested money. The relevant portion of subsection (a) reads as follows:
 
 
 29
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income ... in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in ... interstate or foreign commerce.
 
 
 30
 18 U.S.C. Sec. 1962(a). Section 2 of title 18 defines "principal" to mean whoever commits or aids in the commission of an offense.
 
 
 31
 We read this section to require that a liable person who receives and invests RICO-generated income must have participated as a principal in the underlying racketeering activity. This section prohibits the receipt and investment in an enterprise of any income derived from a pattern of racketeering activity or collection of an unlawful debt "in which such person participated as a principal." We decline to adopt a construction of this statute which interprets the quoted phrase as modifying only "collection of an unlawful debt" and not "pattern of racketeering activity." Such a construction simply does not make sense and has been rejected by the courts. United States v. Wyatt, 807 F.2d 1480, 1482 (9th Cir.), cert. denied, 484 U.S. 858, 108 S.Ct. 170, 98 L.Ed.2d 124 (1987); United States v. Loften, 518 F.Supp. 839, 851, n. 19 (S.D.N.Y.1981), aff'd, 819 F.2d 1130 (2nd Cir.1987); see also Tarlow, RICO: The New Darling of the Prosecutor's Nursery, 49 Fordham L.Rev. 165, 184-85 (1980). Indeed, the Government apparently agrees with the view that "participated as a principal" modifies both "collection of an unlawful debt" and "pattern of racketeering activity." As a matter of policy, the Department of Justice will not approve a RICO prosecution under section 1962(a) unless the defendant is actually charged with having participated in the underlying pattern of racketeering activity. See Racketeer Influenced and Corrupt Organizations (RICO): A Manual for Federal Prosecutors 74 (DOJ 1990).
 
 
 32
 Of course, participation as a principal requires possession of the specific intent associated with the various underlying predicate offenses. We thus reject the Gentys' argument that section 1962(a) requires no culpable state of mind at all. Under this argument, banks would be liable under section 1962(a) merely on the basis that racketeers opened accounts in which they deposited the proceeds of their crimes which were then innocently used in bank operations. Indeed, we hardly think that Congress intended to impose severe civil RICO penalties upon persons who are merely the innocent, unknowing recipients and investors of ill-gotten income.
 
 
 33
 We therefore review the district court's holding that a municipal corporation like Gloucester Township cannot form the mens rea necessary to commit or aid a pattern of racketeering activity. Several other district courts have reached similar holdings. See, e.g., In re Citisource, Inc. Securities Litigation, 694 F.Supp. 1069, 1079-80 (S.D.N.Y.1988); Massey v. City of Oklahoma City, 643 F.Supp. 81, 85 (W.D.Okl.1986). No federal appellate court has yet decided this issue.[4]
 
 
 34
 The RICO statute itself is silent on the issue of mens rea and its legislative history offers no illumination of the congressional intent on this point. Smith & Reed, Civil RICO, p 5.04(4) at 5-31. Some courts have held that RICO imposes no special mens rea requirement in addition to that associated with the underlying predicate crimes. See, e.g., United States v. Biasucci, 786 F.2d 504, 512 (2nd Cir.), cert. denied, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986). In the absence of any judicial authority to the contrary, we assume for the purposes of this discussion that civil RICO requires no special mens rea beyond that associated with commission of a pattern of the individual predicate offenses.[5] When, as in this case, liability is premised on violations of the federal mail fraud statute, 18 U.S.C. Sec. 1341, the defendants must have knowledge of the illicit objectives of the fraudulent scheme and willfully intend that those larger objectives be achieved. United States v. Pearlstein, 576 F.2d 531, 541 (3rd Cir.1978).
 
 
 35
 Citing In Re Citisource, supra, and Massey, supra, the district court here in its Albanese decision relied extensively on the common law rule that punitive or exemplary damages were unavailable against a municipality. Albanese, 710 F.Supp. at 567. The court observed that damages intended to punish a wrongdoer should not "be visited upon the shoulders of blameless and unknowing taxpayers." Id. (quoting City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 267, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981)). However, the court then extended this reasoning to hold broadly that "the criminal intent of an agent of a municipal corporation can never be imputed to the municipal corporation itself." Albanese, 710 F.Supp. at 567. Such a rule, the court found, makes it impossible for a municipality to be liable under RICO. See also Biondolillo v. City of Sunrise, 736 F.Supp. 258 (S.D.Fla.1990); North Star Contracting v. Long Island R.R., 723 F.Supp. 902, 907-08 (E.D.N.Y.1989) (holding transit authority, as a public benefit corporation, immune from civil RICO liability).
 
 
 36
 The reasoning of the above cases to the extent it rests upon a failure of RICO mens rea does not distinguish adequately those situations where municipal corporations are indeed held liable for the tortious or criminal acts of its officials, even where such acts require a malicious, willful or criminal intent. Indeed, no court holding a municipality incapable of forming a RICO mens rea has defined what it meant by the term. Nor have these courts attempted to analyze the elements of the mens rea required for the specific predicate offenses on which the RICO charges are structured. Furthermore, no court discussing the mens rea issue has yet offered a principled basis for distinguishing how a municipality can "form" the requisite intent to be liable for an isolated violation of a predicate offense but be incapable of forming such intent when the offense is part of a pattern of such crimes under RICO. Nor can we discern such a guiding principle.
 
 
 37
 Courts long have held ordinary corporations civilly and criminally liable for the malicious torts or crimes of their high officers, particularly when the corporation benefits from the officers' offensive conduct. See, e.g., New York Central R.R. v. United States, 212 U.S. 481, 492-94, 29 S.Ct. 304, 306-07, 53 L.Ed. 613 (U.S.1909) (holding corporation liable for its agents' crimes); Lake Shore & Michigan Southern R.R. v. Prentice, 147 U.S. 101, 109, 111, 13 S.Ct. 261, 263, 264, 37 L.Ed. 97 (U.S.1893) (holding corporation liable for its agents' intentional torts); United States v. Basic Construction Co., 711 F.2d 570, 573 (4th Cir.), cert. denied, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983) (articulating principles of corporate criminal liability). Most jurisdictions today recognize corporate liability for the crimes of its agents even when the wrong involves malice or some other specific intent. See 10 Fletcher Cyc. Corp. Secs. 4942, 4944, 4951 (1986) and cases collected therein.
 
 
 38
 Similarly, at common law most jurisdictions held municipal corporations acting in a proprietary fashion liable for the wrongs of their agents and officers, with the exception that, absent express statutory authorization, the common law ordinarily did not allow criminal indictments against municipal corporations for certain serious offenses. See 17 McQuillin, Mun. Corp. Sec. 49.88 (3rd ed.); 18 McQuillin, Mun. Corp., Sec. 53.02 (3rd ed.).[6] Municipalities commonly are held civilly liable under state law for the torts of their agents which are accompanied by a specific or malicious intent. See City of Green Cove Springs v. Donaldson, 348 F.2d 197, 201-02 (5th Cir.1965) citing City of Miami v. Simpson, 172 So.2d 435 (Fla.1965); see also 18 McQuillin, Mun. Corp., Sec. 53.62 (3rd ed.) and cases cited therein. Furthermore, under 42 U.S.C. Sec. 1983, a statute which does not expressly hold municipalities liable, the United States Supreme Court concluded that a municipality may be liable for the constitutional torts of its agents when such conduct constitutes a policy or informal custom of the municipal entity even though the agents' acts are carried out with deliberate intent or malice. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
 
 
 39
 Although the prevailing view in most jurisdictions seems to hold that corporate entities in most cases can have imputed to them the mens rea to be civilly liable for wrongs committed with a specific intent, we need not decide in light of the result we reach whether municipal corporations under RICO are an exception to this general rule. Instead, we turn to the purposes of civil RICO, primarily its treble damage provision, to determine whether municipal corporations are within the ambit of its objectives.
 
 
 40
 Congress supplemented the criminal penalties of RICO with this extraordinary civil provision in furtherance of its concern in protecting the public from the evils of racketeer-influenced enterprises. The criminal and civil penalties in the Act thus comprise sharply-cutting edges of a double-edged sword to strike more completely the insidious influences plaguing our nation's enterprises. As the Supreme Court has noted, in addition to the criminal penalties, Congress intended RICO's civil remedies to help eradicate "organized crime from the social fabric" by divesting "the association of the fruits of ill-gotten gains." United States v. Turkette, 452 U.S. 576, 585, 101 S.Ct. 2524, 2530, 69 L.Ed.2d 246 (1981). And as we have previously declared, Congress enlarged "the number of tools with which to attack the invasion of the economic life of the country by the cancerous influence of racketeering activity." United States v. Frumento, 563 F.2d 1083, 1090 (3d Cir.1977). The legislative history of RICO attests to Congress' intention to implement the various provisions therein to provide "sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." Organized Crime Control Act of 1970, 84 Stat. 922, 923 (1970); see also 70 ALR Fed 538, 545 ("the potency of [section 1964(c) ] serves to emphasize Congress' determination to provide a comprehensive arsenal of weapons against the proliferation of organized crime"). Thus, there is convincing authority that Congress authorized civil RICO's powerful treble damages provision to serve a punitive purpose.
 
 
 41
 For well over a century, most jurisdictions have recognized the principle that municipalities, even when acting in their proprietary capacity, are exempt from punitive damages, unless a statute expressly provides such damage awards against municipalities. Newport v. Fact Concerts, Inc., 453 U.S. 247, 260, 101 S.Ct. 2748, 2756, 69 L.Ed.2d 616 (1981); see also 18 McQuillin, Mun. Corp. Sec. 53.18a (3rd ed.) and cases collected therein. The measure of damages assessed against a municipality for its agents' tortious or criminal behavior traditionally has been "the actual damages the plaintiff suffered, and no more." Woodman v. Nottingham, 49 N.H. 387, 394 (1870); accord City of Chicago v. Langlass, 52 Ill. 256, 259 (1869) ("[I]n fixing the compensation the jury have no right to give vindictive or punitive damages against a municipal corporation. Against such a body they should only be compensatory, and not by way of punishment.") The reason behind this common law prohibition is that an assessment of extraordinary damages against a public entity serves neither the retributive nor the deterrent purposes of the civil punishment and contravenes public policy by punishing the taxpayers and citizens who constitute the very persons who "are to benefit from the public example which the granting of such damages is supposed to make of the wrongdoer." Fisher v. Miami, 160 So.2d 57, 59 (Fla.App.1964), aff'd, 172 So.2d 455 (1965).
 
 
 42
 As for retribution, a punitive damage award against the municipality "punishes" only the general public who ordinarily did not participate in the commission of the offense. Newport, 453 U.S. at 267, 101 S.Ct. at 2759. Indeed, punitive damages generally are exacted on those who participated directly in the wrongdoing and against a corporate entity only when the corporation enjoys the benefits of the culpable action and high corporate officials "wielding the whole executive power of the corporation" act with such wanton intent that the punishment is properly "brought home to the corporation." Lake Shore & M.S. Ry. v. Prentice, 147 U.S. 101, 114, 13 S.Ct. 261, 265, 37 L.Ed. 97 (1893). This may have been what one early court meant when it observed that "a municipal corporation can not, as such, do a criminal act or a willful and malicious wrong and they cannot therefore be made liable for exemplary damages." Hunt v. City of Boonville, 65 Mo. 620, 624 (1877) (holding the municipality liable for single damages only) (emphasis supplied). Furthermore, other courts have reasoned that although the public ordinarily benefits from the exaction of punitive damages against a willful or malicious wrongdoer, "the benefit does not follow when the public itself is penalized for the acts of its agents over which it is able to exercise but little direct control." 18 McQuillin, Mun. Corp. Sec. 53.18a (3rd ed.).
 
 
 43
 Turning to the goal of deterrence, punitive damage awards against a municipality will not likely restrain significantly future RICO violations by municipal officials. The Court has noted, "it is far from clear that municipal officials ... would be deterred from wrongdoing by the knowledge that large punitive awards could be assessed based on the wealth of their municipality." Newport, 453 U.S. at 268, 101 S.Ct. at 2760. Moreover, deterrence can be accomplished effectively by assessing punitive damages when appropriate against the offending officials. Thus, not only do such awards gratuitously punish innocent taxpayers, but they are a futile attempt to deter future violations; the equable face of Justice scowls upon the imposition of such gratuitous, pointless punishment.
 
 
 44
 There are at least two major distinctions between municipal corporations and ordinary corporations that militate against imposing punitive damages on the former. First, there is the difference in accountability. Shareholders of an ordinary corporation can require quarterly reports, as is the usual case, or even more frequently of the activities of their corporate officers or directors, and of the corporate operations, and thus have an opportunity to ascertain if there are any illegal or inappropriate activities by the corporation. Municipal officials, on the other hand, make no similar accounting to the public. Residents of a municipality, of course, can exercise their ballots in approval or disapproval but then usually only once every four years. Commenting on residents' capacity to regulate municipal officials' conduct, one court remarked, "While theoretically they have a voice in selecting the agents who shall represent and control the municipality, we know that practically it often happens that the government is not of their choice, and its management not in accordance with their judgment." Ranells v. City of Cleveland, 41 Ohio St.2d 1, 321 N.E.2d 885, 888-89 (1975).
 
 
 45
 Second, a shareholder upon ascertainment or even suspicion of improper conduct can promptly disassociate from the corporation by selling the stock or bringing a derivative, injunctive, or some other appropriate remedial action. In contrast, even if information of fraudulent activity by municipal officers were available, residents of a municipality have little opportunity, if any, for disassociation. The residents perhaps can move into another municipality, a remedy more theoretical than real, depending upon housing availability, a market for the present home, financing, education commitments of children and many other imponderables. Without the level of accountability and opportunity to disassociate which are salient features of the relationship between shareholders and corporate officers and directors, the imposition of punitive damages against the citizenry for the acts of municipal officials lacks the rational basis which traditionally has justified such penalties against ordinary corporations.
 
 
 46
 In an ordinary tort action against a municipal corporation, punitive damages may or may not be awarded to the prevailing plaintiff and thus an action for single damages alone can proceed against the municipality. Single damages, however, are not a possibility under civil RICO. The plain language of section 1964(c) does not permit a court or jury any option in the event of a verdict against the defendant but "requires" an award of treble damages. Cullen v. Margiotta, 811 F.2d 698, 713 (2nd Cir.), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). Thus, were we to allow civil RICO liability against a municipality, it logically follows that the municipality will be subjected to its treble damage provision, which if punitive, is a result that flies in the face of the overwhelming mass of historical and legal precedent.
 
 
 47
 When considering whether the treble damages provision is punitive, RICO section 1964(c) should not be viewed in isolation from the rest of the statute. Indeed, when determining whether a particular statutory provision is punitive, courts generally look in the first instance to whether the purpose of the statute as a whole primarily redresses individual wrongs or more general wrongs to the public. Huntington v. Attrill, 146 U.S. 657, 673-74, 13 S.Ct. 224, 229-30, 36 L.Ed. 1123 (1892); Murphy v. Household Finance Corp., 560 F.2d 206, 209 (6th Cir.1977); Summers v. Federal Deposit Ins. Corp., 592 F.Supp. 1240, 1242 (W.D.Okl.1984). As discussed above, Congress obviously had much more in mind than merely providing compensation for individual RICO victims when it authorized RICO civil actions. Indeed, the harm of racketeering is dispersed among the public at large, including draining resources from the economy, subverting the democratic process, and undermining the general welfare. Congress must have recognized the underlying power in the imposition of treble damages as a deterrent and effective penal force in the battle against such organized criminal activity. Thus, Congress' overall purpose in passing RICO, to redress serious harm to the nation as a whole, is evidence of the punitive character of the treble damages provision.
 
 
 48
 Moreover, the furnishing of a civil remedy far in excess of the amount necessary to compensate an injured RICO victim is further confirmation that these damages are punitive. Murphy, 560 F.2d at 209; Summers, 592 F.Supp. at 1242. Although in some special contexts courts have stated that statutory multiple damages may be liquidated damages to assure the plaintiff's full compensation, see United States v. Bornstein, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976),[7] the more generally applicable principle is that multiple damages are imposed as a penalty for egregious conduct of the wrongdoer and a means of deterring the future repetition of such conduct. See, e.g., Lyons v. Westinghouse Electric Corp., 222 F.2d 184, 189 (2d Cir.), cert. denied, 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955).
 
 
 49
 The characterization of statutory multiple damages as a form of civil punishment has a long and venerable history in American jurisprudence. In 1885, the Supreme Court upheld a Missouri statute which required every railroad to erect and maintain fences and cattle guards along its railways and imposed double damages for injuries to cattle or other animals for breach of the statute. Missouri Pacific Ry. Co. v. Humes, 115 U.S. 512, 6 S.Ct. 110, 29 L.Ed. 463 (1885). Justice Field, writing for the Court, held that the "omission to erect and maintain such fences and cattle guards ... would justly be deemed gross negligence, and if, in such cases, where injuries to property are committed, something beyond compensatory damages may be awarded to the owner by way of punishment for the company's negligence." Id. at 522, 6 S.Ct. at 113 (emphasis supplied).
 
 
 50
 Justice Field further observed that,
 
 
 51
 The statutes of nearly every State of the Union provide for the increase of damages where the injury complained of results from the neglect of duties imposed for the better security of life and property, and make that increase in many cases double, in some cases treble, and even quadruple the actual damages. And experience favors this legislation as the most efficient mode of preventing, with the least inconvenience, the commission of injuries.... The injury actually received is often so small that in many cases no effort would be made by the sufferer to obtain redress, if the private interest were not supported by the imposition of punitive damages.
 
 
 52
 Id. at 523, 6 S.Ct. at 114 (emphasis supplied). The Court, thus, early viewed statutory multiple damages as an effective means of assuring the enforcement of existing laws and deterring future injury when the legislature in situations concerning the "security of life and property" afforded the private litigant a premium for bringing suit. More recently and in the context of a substantially similar provision in the antitrust act, the Supreme Court stated that, in addition to compensating victims, "treble damages also play an important role in penalizing wrongdoers and deterring wrongdoing, as we have frequently observed," Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 485, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977), and that the "very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct." Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981).
 
 
 53
 Indeed, several courts already have concluded that the treble damages provision at issue here is punitive in character. The United States Court of Appeals for the Fifth Circuit, addressing the question whether the trebled portion of RICO damages was remedial or penal, held that it was penal, observing that "Congress trebled RICO damages as part of [its] overall attack on the public wrongs of organized crime." Abell v. Potomac Ins. Co., 858 F.2d 1104, 1141 (5th Cir.1988). The United States Court of Appeals for the Seventh Circuit similarly held that a civil RICO claim for treble damages is best characterized as "penal in nature." Tellis v. U.S. Fidelity & Guar. Co., 805 F.2d 741, 746 (7th Cir.1986) vacated in part 483 U.S. 1015, 107 S.Ct. 3255, 97 L.Ed.2d 755 (1987).
 
 
 54
 If the instant case is an example of RICO suits against a municipal corporation, it is evident that an award of treble damages would be punitive rather than liquidated damages to assure full compensation. The plaintiffs here easily can establish the compensatory damages they may have sustained to the market value of their homes by calculating the difference between their financial investment in their homes and the market value as a result of the toxicity of the nearby dump. Presented with a reliable means of determining actual harm, assessing treble damages against the municipality, thus, would impose punitive damages upon the innocent taxpayers in favor of the plaintiffs who already may have recourse for their full compensation in a non-RICO cause of action against the municipality and a RICO action against the municipal officers themselves.
 
 
 55
 Indeed, in several respects the scenario of this alleged RICO racket case demonstrates how far afield we have wandered from the "heartland" of Congress' initial intention for RICO actions. Instead of elements of organized crime being on trial, here it is the public. Instead of gross malfeasance or violent crimes as the underlying predicate offenses, the primary charge against the Township is merely an alleged failure to provide information to prospective home purchasers. Finally, the information alleged to have been fraudulently withheld by the Township pertaining to a visible landfill is information that appears to have been readily obtainable upon inquiry, inspection, or investigation.
 
 
 56
 To be sure, Congress intended section 1964(c) in part to compensate innocent victims. See Shearson/American Express Inc. v. McMahon, 482 U.S. 220, 240-41, 107 S.Ct. 2332, 2344-45, 96 L.Ed.2d 185 (1987). However, bearing in mind the strong weight of authority which supports the characterization of treble damages as punitive, we hold that RICO's overall purpose to thwart the generalized harm wrought by racketeering activity, its dependence on statutory crimes, and the mandatory provision for treble damages are sufficient evidence of Congress' intention that the treble damages provision serve a predominantly punitive purpose.
 
 
 57
 Although treble damages necessarily compensate the immediate RICO victim, the prevailing punitive nature of section 1964(c)'s compulsory award of treble damages convinces us that Congress, in keeping with the common law, did not intend to subject municipal corporations to RICO liability. Courts will not interpret statutes to overturn well-established common law principles unless Congress so authorizes. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 67, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989) (holding that Congress in passing the civil rights act did not intend to override well-established common law immunities and defenses); Newport, 453 U.S. at 266, 101 S.Ct. at 2759 (finding no evidence that Congress intended to disturb the settled common-law municipal immunity from punitive damages). Whereas in other statutes Congress expressly provided that Government entities shall be held civilly liable for criminal activities, such as under the federal securities laws, see 15 U.S.C. Sec. 77b(2), the RICO statute expresses no specific intention that municipalities be liable for treble damages.
 
 
 58
 The argument advanced by the Gentys that a district court could in its discretion award only compensatory damages against a municipality under section 1964(c) does not convince us that a RICO claim should lie against the Township. It is clear that trial courts and juries are at no liberty under RICO to award any amount less than treble damages. The plain language of that statute instructs that injured persons "shall recover" treble damages and costs and attorneys fees. One court thus has observed that civil RICO "requires" that the successful plaintiff be awarded treble damages. Cullen v. Margiotta, 811 F.2d 698, 713 (2nd Cir.), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987). As Chief Justice Rehnquist observed when commenting on a substantially similar provision in the anti-trust statute, "It will take a considerable feat of judicial gymnastics to conclude that municipalities are not subject to treble damages," when the language of that statute is mandatory. Community Communications v. Boulder, 455 U.S. 40, 65, n. 2, 102 S.Ct. 835, 848 n. 2, 70 L.Ed.2d 810 (Rehnquist, J., dissenting).[8] We refrain from making the judicial leap urged by the plaintiffs.
 
 
 59
 We thus hold that a civil claim brought under section 1964(c) of the RICO Act, with its mandatory award of treble damages which are punitive in character, cannot be maintained against a municipal corporation. In so doing, we iterate that we perceive no intention of Congress to abrogate the long-established and salutary principle of common law prohibiting punitive damages against municipalities.
 
 
 60
 IV. TRIAL COURT'S DIRECTED VERDICT FOR REMAINING RICO DEFENDANTS
 
 
 61
 At the close of plaintiffs' evidence during the 1986 trial, the court directed a verdict on all fraud counts, RICO and otherwise, in favor of several of the defendants, namely the lender, City Federal, and its employees. The district court concluded that the plaintiffs had presented no evidence to support an inference that any of the bank defendants knew that the GEMS landfill was dangerous and toxic on or before the time that the Gentys contracted to buy their house at Briar Lake, applied for a residential mortgage, or received a mortgage commitment. Other testimony, the court continued, established that the GEMS landfill was generally believed to be a sanitary landfill which was scheduled to be closed.
 
 
 62
 On appeal, the plaintiffs only dispute the RICO portion of the directed verdict; that is, they maintain that there was sufficient evidence at trial from which it could be inferred that the lender defendants had violated RICO. This court exercises plenary review over a grant of a directed verdict. "A motion for directed verdict under Fed.R.Civ.P. 50(a) should be granted only if, viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury, and any verdict other than the one directed would be erroneous under the governing law." Macleary v. Hines, 817 F.2d 1081, 1083 (3rd Cir.1987).
 
 
 63
 As noted above, to prevail on a civil RICO claim, the plaintiffs must prove that the defendants committed at least two predicate acts of racketeering within a ten-year period which constitute a pattern. Here, the Gentys premised their RICO complaint on violations of the federal mail fraud statute, 18 U.S.C. Sec. 1341. The plaintiffs, however, did not adduce any evidence demonstrating that the City Federal defendants engaged in a pattern of racketeering activity to defraud plaintiffs. In their brief on appeal, the plaintiffs cite the following evidence as purportedly establishing a pattern of racketeering: (1) City Federal "was aware that the brochure [disseminated by the developers and describing the Briar Lake development] made no mention of the GEMS landfill despite its awareness of possible health problems associated with the landfill"; (2) a lender defendant "failed to divulge that [Thomas] Oliveri had submitted fraudulent loan commitments in connection with the Briar Lake development"; (3) City Federal on two occasions created internal memoranda that suggested no odor emanated from the landfill; and (4) another defendant "who was very much aware of the dangers of the lake orchestrated an attempt to drain and clean up the discolored lake."
 
 
 64
 Not only does the above not constitute a "pattern of racketeering," none of the cited "evidence" establishes even a single RICO predicate offense. Failure to disclose something without anything further or the creation of internal memoranda is not mail fraud under 18 U.S.C. Sec. 1341 nor is it a state felony counted under RICO's definition of racketeering activity. 18 U.S.C. Sec. 1961(1). And one wonders how the orchestration of an attempt to drain and clean up the discolored lake could constitute a criminal offense. Thus, taken as true, the Gentys' cited evidence does not even suggest a RICO claim against City Federal and the individual bank defendants because the predicate criminal offenses under the statute's definition of "racketeering" are wholly absent.[9]
 
 
 65
 The court also granted the motions for directed verdict of defendants Daniel Riif, a former Township official, and Yei-Shong Sheih, the president of Diamond Crest and an investor in the Briar Lake development.[10] The court so ruled because the plaintiffs adduced at trial no direct evidence or circumstantial evidence that these defendants "wilfully participated in the [fraudulent] scheme with the intent that its illicit objectives be achieved," United States v. Pearlstein, 576 F.2d 531, 541 (3rd Cir.1978), as is required to establish a federal mail fraud violation. First, there was no direct testimony at trial that these defendants knew of a scheme to defraud the home-buyers. Furthermore, the record does not contain circumstantial evidence supporting such guilty knowledge. Indeed, the absence of any evidence of anything more than an arms-length business relationship between Riif and the Oliveris, the lack of any excessive financial return to these defendants from the allegedly fraudulent real estate scheme, and the minor roles these defendants played in the Briar Lake development refutes the possibility of drawing a reasonable inference that these defendants wilfully and knowingly participated in the overall fraudulent scheme. We thus conclude that the district court properly granted the motions of Riif and Sheih for a directed verdict.
 
 V. THE TRIAL COURT'S EVIDENTIARY RULINGS
 A. Dr. Patel
 
 66
 The plaintiffs object to the trial court's exclusion of the testimony of two of its proposed expert witnesses, Dr. Patel and Dr. Brubaker. This court reviews the district court's evidentiary rulings under the abuse of discretion standard. In Re Japanese Electronic Products, 723 F.2d 238, 260 (3rd Cir.1983) rev'd in part 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
 
 
 67
 At trial, the Gentys sought to offer the testimony of Dr. Patel of the New Jersey Health Department who in 1980 examined the GEMS landfill and discovered that it contained a variety of toxic chemicals. Dr. Patel had counseled the Township against the development of the area around the landfill. At a sidebar conference before the court, the plaintiffs stated that Patel's testimony was being offered because it "put Gloucester Township on notice that this development was considered a bad idea by the experts in Trenton and it became to some degree a matter of public knowledge." The Township, however, was not a defendant at trial, and the plaintiffs did not assert that Patel's recommendation put any of the trial defendants on notice. In addition, Patel's recommendation came after the development had been approved and the Township had become legally obligated to grant permission for construction.
 
 
 68
 The district court found Patel's proposed testimony to be irrelevant to the issue of the liability of the trial defendants and perhaps prejudicial to those defendants who were not put on notice by Patel's report of the toxicity of the GEMS landfill. Because Patel reported only to the Township, this ruling appears to be supported by the record and the district court thus did not abuse its discretion in excluding Patel. Moreover, Patel's testimony was not essential to the other element of plaintiffs' case because the hazardous nature of the landfill had been established by other testimony.
 
 B. Dr. Brubaker
 
 69
 The district court also excluded the plaintiffs' proffered testimony of toxicologist Dr. Brubaker. The plaintiffs offered Brubaker to render the expert opinion that the plaintiffs' injuries could have been caused by exposure to the toxic chemicals present in the GEMS landfill. According to plaintiffs' counsel's assertion at sidebar, "Brubaker [would] testify on the basis of what the plaintiffs [would] report as problems they had, headaches, nausea, diarrhea, that these are things caused by the substances emanating from the landfill." Brubaker, however, was not a medical doctor and he did not examine the plaintiffs. Indeed, none of the plaintiffs had been examined by a medical doctor as a result of their complaints. The district court excluded Brubaker's testimony stating that the plaintiffs "have not produced a medically qualified expert to testify about causation. Their proposed expert for physical injuries is a toxicologist, not a medical doctor."This court recently reversed a district court which excluded the testimony of a trained toxicologist in a toxic tort case simply because she was neither a chemist nor a medical doctor. In Re Paoli R.R. Yard PCB Litigation, 916 F.2d 829, 855 (3rd Cir.1990). There, this court stated,
 
 
 70
 The district court's insistence on a certain kind of degree or background is inconsistent with our jurisprudence in this area. The language of Rule 702 [governing the admission of expert witnesses] and the accompanying advisory notes make clear that various kinds of "knowledge, skill, experience, training, or education," qualify an expert as such.
 
 
 71
 Id. at 855. This court, applying a liberal reading of Rule 702, held that the district court abused its discretion in excluding the testimony of a qualified toxicologist in a toxic tort litigation "simply because the experts did not have the degree or training which the district court apparently thought would be most appropriate." Id. at 856.[11] Although not a toxic tort litigation, this principle applies here with equal force when the plaintiffs' alleged damages rely upon an assessment of the harm caused by a toxic waste dump.
 
 
 72
 The only reason given by the trial court for the exclusion of Dr. Brubaker is that he was not a medical doctor. Medical doctors, however, are not the only experts qualified to render an opinion as to the harm caused by exposure to toxic chemicals. The trial court's exclusion of Brubaker, without considering his credentials as a doctor of toxicology, simply because he did not possess a medical degree, is inconsistent with expert witness jurisprudence.
 
 
 73
 Nonetheless, we affirm the court's holding on other grounds. In the first place, the plaintiffs have not adduced sufficient evidence on appeal demonstrating that Dr. Brubaker is indeed a qualified expert toxicologist. Outside the bare statement in their appellate brief that he is a scientifically-trained toxicologist holding a Ph.D., we can find nothing more in the record supporting his credentials as an expert. There is no curriculum vitae; no recitation of studies conducted or methods used; no inclusion of articles published; indeed, nothing supplementing the unadorned assertion in their brief to verify Brubaker's qualifications as an expert toxicologist.
 
 
 74
 Moreover, according to the record, the plaintiffs offered no evidence as to how Brubaker would connect the toxic chemicals at the GEMS landfill to these plaintiffs' alleged injuries. He did not physically examine the plaintiffs and their symptoms. Brubaker may have been qualified as a toxicologist to identify poisons generally and offer treatment for exposure to poisons, but there is no evidence in this record that would connect the presence of poisons to the plaintiffs' particular grievances.
 
 
 75
 The plaintiffs state in their brief that Brubaker's opinion "would have been based on individual plaintiff observations reporting the presence of odors in and around plaintiffs' residences." He thus would have relied, not on firsthand observation, but merely on the reports of the plaintiffs. He obviously had not conducted the personal physical investigation necessary to form an expert opinion that toxins in the landfill caused the plaintiffs' symptoms. Indeed, the plaintiffs concede that Brubaker could not have testified to a reasonable certainty as to such causation with the following statement in their brief: "Dr. Brubaker would have proffered testimony that exposure via inhalation to these emanating odors consisting of the alleged volatile organic chemicals and other toxic substances may account for the frequent and severe health problems suffered by the plaintiffs." (emphasis added).
 
 
 76
 The instant situation is thus significantly different from the tendered toxicology expert in In Re Paoli. There, the toxicologist proposed to establish a causal relationship between exposure to PCB's and the plaintiffs' illnesses by using the results of tests of the plaintiffs' blood as well as comparison with the medical and clinical records of the plaintiffs. In Re Paoli, 916 F.2d at 839. No such personal examination or study of the plaintiffs occurred in the instant case.
 
 
 77
 Although the district court should not have excluded Brubaker for the reason given, the exclusion will be affirmed on the grounds that the plaintiffs did not establish that Brubaker had the requisite expert credentials in his field nor the proper foundation in this case to proffer an expert opinion as to the cause of the plaintiffs' illnesses. An expert witness who may be qualified to attest to the toxicity of various substances nevertheless may be excluded when the expert possesses no firsthand knowledge connecting the hazardous substances to the particular grievances and symptoms of the plaintiffs.
 
 C. Damages for Personal Injury
 
 78
 The district court ruled on October 25, 1984, that the plaintiffs could not recover damages for alleged personal injuries due to exposure to the toxic waste under RICO, but that only damages to business or property would be compensable. Because the court permitted the RICO claims against the Oliveris to go to the jury which returned an award of $3,000, we must determine under plenary review whether such a limitation on damages was correct.
 
 
 79
 In addition to economic harm occasioned by the loss of the market value of their homes, the plaintiffs sought relief under RICO for manifest and latent injuries to physical and mental health, including emotional distress resulting from the fear of developing cancer. The plaintiffs also requested medical expenses incurred for treatment of illnesses caused by the dump. By its express terms, however, RICO provides for recovery only for "any person injured in his business or property." 18 U.S.C. Sec. 1964(c). In ordinary usage, "injury to business or property" does not denote physical or emotional harm to a person. Indeed, the Supreme Court has declared that Congress' limitation of recovery to business or property injury "retains restrictive significance. It would for example exclude personal injuries suffered." Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). A number of courts have held that an action for personal injuries thus cannot be maintained under the RICO statute.[12] The court in Drake v. B.F. Goodrich, 782 F.2d 638 (6th Cir.1986), for example, stated that RICO's business or property limitation barred a wrongful death action under RICO.
 
 
 80
 Congress' apparent unwillingness to allow recovery for personal injuries under RICO appears to be consistent with enacting RICO and its specific intention to thwart the organized criminal invasion and acquisition of legitimate business enterprises and property. Ample law already existed to provide recovery for wrongfully inflicted personal injuries. The unavailability of a civil RICO treble damages action for personal injuries in no way restricts the plaintiff's right to bring a pendent state wrongful death or personal injury action along with a RICO action for damages to business and property. We discern no injustice in limiting a RICO plaintiff's recovery for his personal injuries to ordinary non-RICO legal measures.
 
 
 81
 We thus refuse to enlarge Congress' specific limitation of RICO recovery to business and property. The significance of section 1964(c)'s plain language is clear: RICO plaintiffs may recover damages for harm to business and property only, not physical and emotional injuries due to harmful exposure to toxic waste.
 
 
 82
 VI. LIMITATIONS PERIOD ON GENTYS' 42 U.S.C. Sec. 1983 CLAIM
 
 
 83
 In their complaint, the plaintiffs also asserted a constitutional tort claim against the Township under 42 U.S.C. Sec. 1983 for infringing upon their liberty and property rights.[13] Plaintiffs filed their claim on October 13, 1983. The district court found that the plaintiffs first knew of the hazardous nature of the nearby GEMS landfill in September 1981 and that the limitations period began to accrue then. The court thus dismissed the plaintiffs' section 1983 action as time-barred by a two-year limitations period.
 
 
 84
 In reviewing the district court's determination, this court must decide whether the district court chose the appropriate analogous state limitations period and whether that period began to accrue in September 1981. This court exercises plenary review over the legal questions inherent in this issue but must accept the district court's factual findings unless clearly erroneous.
 
 
 85
 The Gentys do not contest that a two-year limitations period applies to their section 1983 claim. Indeed, the Court in Wilson v. Garcia, 471 U.S. 261, 276, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985), held that for section 1983 the courts should select the state statute of limitations period applicable to personal injury torts. This court subsequently held that New Jersey's two-year limitations period on personal injury actions, N.J.S.A. 2A:14-2, applies to a civil rights claim under section 1983. Cito v. Bridgewater Tp. Police Dept., 892 F.2d 23, 25 (3rd Cir.1989). Thus, the district court here correctly applied a two-year limitations period to the Gentys' section 1983 claim.
 
 
 86
 Federal law which governs the accrual of section 1983 claims establishes that the limitations period begins to run from the time when the plaintiff knows or has reason to know of the injury which is the basis of the section 1983 action. Deary v. Three Un-Named Police Officers, 746 F.2d 185, 197, n. 16 (3rd Cir.1984) (quoting Sandutch v. Muroski, 684 F.2d 252, 254 (3rd Cir.1982)). The limitations period for the filing of the Gentys' section 1983 claim thus accrued at the moment the plaintiffs had notice of the hazardous nature of the GEMS landfill. In their complaint, the plaintiffs aver that, "on or about September 1981, plaintiffs learned from a neighbor that HUD had 'redlined' the area of the GEMS landfill because [it] was toxic and hazardous to area homeowners." The obvious date for accrual of the Gentys' civil rights action, therefore, is September 1981.
 
 
 87
 The plaintiffs contend on appeal, however, that they erred in their complaint and that they did not receive notice of the landfill's hazardous nature until October 20, 1981. Whatever erroneous beliefs the plaintiffs may have harbored when filing their complaint, the district court surely was entitled to rely on statements contained therein. The court, thus, properly concluded that the section 1983 action began to accrue in September 1981, the date when the plaintiffs allege in their complaint they first became aware of the hazardous nature of the landfill. As the plaintiffs failed to file their complaint until October 1983, more than two years after this date, the court properly dismissed this claim as time-barred.
 
 VII. CONCLUSION
 
 88
 In sum, we hold that the district court properly certified this appeal under Fed.R.Civ.P. 54(b); that a civil RICO claim, with its mandatory and punitive treble damage provision, cannot be maintained against a municipality like Gloucester Township absent Congress' declaration to the contrary; that the trial court did not err in directing a verdict for City Federal, the individual bank defendants, and Riif and Sheih; that the trial court did not err in excluding the proposed expert testimony of Patel and Brubaker; that the plaintiffs' alleged personal injuries for exposure to the toxic waste were not compensable under RICO section 1964(c); and that the district court correctly considered the Gentys' 42 U.S.C. Sec. 1983 claim time-barred by the applicable two-year statute of limitations period.
 
 
 89
 Accordingly, the judgment of the district court will be affirmed.
 
 
 
 [1]
 Although we affirm the district court's judgment in favor of Gloucester Township, we do not decide for reasons stated herein whether a municipal corporation can form the requisite intent under RICO. An appellate court may affirm the order of a district court for different reasons even if the reasons relied upon by the district court were wrong. Myers v. American Dental Ass'n, 695 F.2d 716, 725, n. 14 (3rd Cir.1982) cert. denied, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983)
 
 
 [2]
 Rule 54(b) provides in part:
 When more than one claim for relief is presented in an action ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.
 
 
 [3]
 The district court did not, as the plaintiffs requested, enter final judgment for the other plaintiff homeowners because "other defendants remain in those cases and there are still settlements to be approved on behalf of the minor plaintiffs." Genty, 736 F.Supp. at 1330. The court also denied the plaintiffs' motion for certification of an interlocutory appeal under 28 U.S.C. Sec. 1292(b)
 
 
 [4]
 The U.S. Court of Appeals for the Ninth Circuit recently held that government entities are immune from RICO liability because they cannot form the requisite malicious intent. However, that opinion, Lancaster Cmnty. Hosp. v. Antelope Val. Hosp. Distr., which appeared in the advance sheets at 923 F.2d 1378 (9th Cir.1991), was withdrawn from publication pending the issuance of an amended opinion
 
 
 [5]
 The United States Supreme Court has refused to go beyond the plain meaning of the RICO statute and import special requirements of proof peculiar to RICO. Thus, in Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 495, 105 S.Ct. 3275, 3284, 87 L.Ed.2d 346 (1985), the Court held that no special "racketeering injury" must be proved for a civil RICO plaintiff to recover beyond the ordinary harm suffered by the victims of the individual predicate crimes
 
 
 [6]
 One authority states that municipal corporations cannot be
 indicted for offenses which derive their criminality from evil intention, or which consist in a violation of social duties which pertain to persons. They cannot be guilty of treason or a felony. But beyond this they are not exempt from the consequences of unlawful and wrongful acts committed by their agents in pursuance of authority derived from them.
 
 
 [17]
 McQuillen, Mun. Corp., Sec. 49.88 (3rd ed.). Of course, this case, which presents only civil liability arising under 18 U.S.C. Sec. 1964(c), does not raise the question of indictment and criminal liability under section 1963 of RICO
 
 
 [7]
 In Bornstein, the Court observed that Congress authorized the double damages provision in the False Claims Act to insure that the Government would be completely compensated for the costs, delays, and inconveniences occasioned by the submission of fraudulent claims. Bornstein, 423 U.S. at 315, 96 S.Ct. at 530. By way of partial explanation of its conclusion, the Court noted that in its original form, the False Claims Act envisioned that private parties would enforce its civil provisions through a qui tam action, under which the private party enforcing the public right would receive one-half of the Government's recovery. Thus, Congress authorized double damages to assure full recovery by the Government even under a qui tam action
 
 
 [8]
 In Boulder, a majority of the Court applied its earlier holding in Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), to conclude that municipalities could be held liable under the anti-trust civil enforcement provisions which are substantially similar to section 1964(c) of civil RICO. In neither case, however, did the Court confront the issue of whether the treble damage provision was mandatory. Boulder, 455 U.S. at 65, 102 S.Ct. at 848 (Rehnquist, J., dissenting) ("The Court understandably leaves open the question whether municipalities may be liable for treble damages...."); Lafayette, 435 U.S. at 402, n. 22, 98 S.Ct. at 1131, n. 22. In response to these two decisions holding municipalities liable, Congress subsequently amended the anti-trust laws to exempt local government entities from liability for damages arising under the antitrust statute. Local Government Antitrust Act of 1984, Pub.L. 98-544, 98 Stat. 2750, codified at 15 U.S.C. Secs. 34-36
 
 
 [9]
 Because the district court's grant of a directed verdict for City Federal was proper, this court need not reach the question raised in appellee Resolution Trust Corporation's brief whether, as the federal receiver for the insolvent City Federal, Resolution Trust is immune from RICO damages under the doctrine of sovereign immunity
 
 
 [10]
 The appellants failed to include any reference in the record to Sheih or his purported role in the alleged real estate fraud. We therefore decline to review the district court's granting of Sheih's motion for a directed verdict. As to Sheih, the trial court found that he was "essentially a passive investor." In the absence of anything in the record concerning Mr. Sheih, we will not disturb the district court's finding
 
 
 [11]
 More recently and in a different context, this court reaffirmed its liberal jurisprudence under the federal expert admission rules in United States v. 68.94 Acres of Land, 918 F.2d 389 (3rd Cir.1990). There, the district court in an eminent domain proceeding excluded the testimony of a qualified real estate economist as to the value of condemned land simply because she was not a traditional land appraiser. This court held that an economist "is qualified to testify about the market value of property although his valuation methodology is somewhat unique." Id. at 395
 
 
 [12]
 See, e.g., Fleischhauer v. Feltner, 879 F.2d 1290, 1300 (6th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990); Drake v. B.F. Goodrich, Co., 782 F.2d 638 (6th Cir.1986); Moore v. Eli Lilly & Co., 626 F.Supp. 365 (D.Mass.1986); Cuzzupe v. Paparone Realty Co., 596 F.Supp. 988 (D.N.J.1984); Callan v. State Chemical Mfg. Co., 584 F.Supp. 619 (E.D.Pa.1984). This court has held that the loss of employment due to racketeering activity is injury to "business" not personal injury and so resulting loss of wages, benefits, and damage to reputation are compensable under section 1964(c). Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1170 (3rd Cir.1989)
 
 
 [13]
 The Gentys allege in their complaint that the Township deprived them of their constitutional rights to property and liberty without due process because
 as the owner of the GEMS landfill ... [the Township through its officials] knowingly and willfully and under color of state law adopted a policy, custom and/or practice of permitting hazardous chemical wastes to be improperly dumped in the GEMS landfill ... thus creating condition which they knew and/or should have known to be severely hazardous to the health and safety of nearby residents, including plaintiffs.