# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 18, 2015

Lyle W. Cayce
Clerk

No. 13-20753

THE GIL RAMIREZ GROUP, L.L.C.; GIL RAMIREZ, JR.,

Plaintiffs - Appellants

v.

HOUSTON INDEPENDENT SCHOOL DISTRICT;
LAWRENCE MARSHALL; EVA JACKSON; RHJ-JOC, INCORPORATED;
FORT BEND MECHANICAL, LIMITED; MARSHALL & ASSOCIATES;
JOYCE MOSS CLAY; JM CLAY AND ASSOCIATES;
FBM MANAGEMENT, L.L.C.; DAVID L. MEDFORD,

Defendants - Appellees

Appeals from the United States District Court
for the Southern District of Texas

Before REAVLEY, JONES, and ELROD, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This case, involving multiple causes of action based on allegations of bribery to procure construction contracts, was filed against Houston Independent School District ("HISD" or "the District"), former trustee Lawrence Marshall and his consulting company, alleged coconspirator Joyce Moss Clay and her consulting company, and two of the plaintiff's competitors (RHJ-JOC and Fort Bend Mechanical), and their respective owners. The district court ably resolved most of these kaleidoscopic claims against Plaintiff-Appellants Gil Ramirez, Jr. and the Gil Ramirez Group, L.L.C. (collectively "GRG"), but we conclude GRG has met its summary judgment burden with

No. 13-20753

respect to its RICO claims (against all defendants except HISD) and has sufficiently supported those elements of its claims for tortious interference with business relations that the district court ruled on. For those claims, we reverse and remand for further proceedings. This decision requires resolving two novel issues in this circuit—whether HISD is a proper RICO defendant (it is not), and whether Appellee Marshall, a former elected HISD trustee, may invoke state sovereign immunity principles against the state law claims (he cannot).

## BACKGROUND[1]

Defendant Houston Independent School District is one of the largest school districts in the nation, serving over 200,000 students. A nine-member Board of Trustees governs the district; the administrative staff is led by the Superintendent. The District procures some construction and facilities services through a job-order contract ("JOC") program. Under this program, the District periodically solicits requests for proposals ("RFPs"), following which a committee of HISD administrators (the "selection committee") evaluates vendors' bids against predetermined criteria and selects as many qualifying vendors as current needs require. The single most important factor in the selection process is the vendor's pricing coefficient—a percentile that reflects the difference between the standard price set in a pricing manual and the price a contractor agrees to charge. Pricing coefficients are assigned for several categories of work and are combined to determine the vendor's weighted average. The selection committee forwards its recommendations to the Board of Trustees, which then votes on whether to offer JOC contracts to the suggested vendors.

---

[1] For purposes of reviewing the pretrial orders on appeal, the evidence is recited in the light most favorable to Appellants.

No. 13-20753

HISD outsourced the assignment and management of JOC projects to several independent project managers, each of which covered specific facilities. The District would inform the relevant project manager of its need and the project manager would solicit cost estimates from the JOC vendors, evaluate the estimates, assign the jobs, and manage their progress.

Ramirez alleges that he and his company GRG were punished for refusing to participate in the corruption of municipal authorities. Defendant Lawrence Marshall, for many years an administrator at HISD until he was elected Trustee in 1997, masterminded questionable business arrangements in which he served as a paid consultant for several organizations that did business with the District. When the District explicitly prohibited that conduct, those companies hired Marshall's business associate Joyce Moss Clay (together with her company, "Clay"), whose company began paying Marshall a share of its consulting fees.

Ramirez and Marshall crossed paths during an RFP initiated in May 2008 (the "2008 RFP") to expand the HISD's contractor capacity and increase vendor diversity. GRG bid in this RFP along with ten other companies, including Defendants Fort Bend Mechanical ("FBM") and RHJ-JOC ("RHJ") (collectively, with their owners, the "vendor defendants"). The vendor defendants both hired Clay as a consultant, in RHJ's case "to provide moral support." RHJ paid Clay over $2,000 per month for several years, but neither RHJ nor Clay could explain what work Clay actually performed. FBM's owner Pete Medford avers that he wanted to make donations to specific schools and hired Clay to help him negotiate the rules and regulations governing those donations. Clay's explanation for forwarding Marshall 65% of her consulting fees is that he was her "mentor."

No. 13-20753

Once the initial bids were in, an employee in HISD's procurement department (who also served on the selection committee) advised several companies to reallocate their pricing coefficients. No bidding vendor was permitted to change its overall coefficient; such a change would have given that vendor an unfair advantage.[2] On its first cut, the selection committee recommended approving the two companies with the lowest overall price: RHJ and Kellogg Brown & Root Services, Inc. ("KBR"). GRG ranked ninth and the selection committee summarily eliminated it along with several other companies. Senior HISD administrators reviewed the proposal and, based on an internal policy, disqualified RHJ because of a then-pending lawsuit between the vendor and another school district.

Left with only one proposed vendor, HISD Superintendent Dr. Abelardo Saavedra and Chief Business Operations Officer Richard Lindsay unilaterally added four vendors to the list that went before the Board of Trustees: FBM for its HVAC expertise, and the other three, including GRG, to increase JOC "diversity." The Board approved this slate of five vendors, only one of which (KBR) had the approval of the selection committee. It is noteworthy that the selection committee passed over GRG, and HISD administrators added the company solely for diversity reasons.[3] Shortly after learning that it was not among HISD's selected JOC group, RHJ fired Clay.

GRG and the other contractors executed one-year contracts, renewable at HISD's sole discretion, thus constituting the 2009 JOC program. When the

---

[2] GRG alleges that even this communication was improper; the District maintains that reapportioning coefficients could not improve a vendor's score.

[3] Lindsay testified that the District's goals in the 2008 RFP were, among others, "to diversify the available skillsets of JOC vendors" and "to increase the number of minority-owned businesses within the JOC program." Lindsay recommended adding FBM for the former kind of diversity and the other three companies for the latter.

No. 13-20753

District began assigning projects the following summer, GRG received more project funds than any other vendor. GRG maintains that it was a JOC vendor *par excellence*, completing jobs properly, ahead of schedule, and under budget. Appellees dispute this. The District reports that it "experienced a number of performance issues with GRG . . . including false starts on construction projects, failure to obtain proper bonding and insurance, and failure to timely submit documents required under" the JOC program.

Marshall became president of the Board of Trustees in January 2009. The next month, Superintendent Saavedra announced his resignation, effective at the end of August of that year. In August, Saavedra recommended that the Board reconsider RHJ because its lawsuit with the other school district was over. The Board agreed and added RHJ to the approved JOC list. Saavedra testified that he was "very hesitant" to recommend RHJ for approval and that Marshall was putting "tremendous pressure" on other senior administrators.[4] He also testified that he had lost Marshall's support by disqualifying RHJ earlier in the process.

According to GRG, the trouble began after August 2009. Once RHJ was in the mix, GRG saw a sharp decline in the volume of JOC work it received, though it continued to receive assignments until its contract expired. Ramirez testified that Ricardo Aguirre, a janitorial services consultant and mutual associate of Marshall and Ramirez's father, visited Ramirez's office. Aguirre

---

[4] GRG also argues that there is evidence suggesting that RHJ was supposed to supplant GRG. The only evidence to which it directs us is the former procurement manager's obscure reference to "substitut[ing] a supplier," but the context suggests he is referring to the improprieties with the 2008 vendor recommendations, not RHJ's later addition. GRG also identifies an email from an internal auditor referring to GRG's JOC proposal and admonishing "the replacement JOC contractor to do their own scope and proposal." The evidence also shows, however, that the program manager that handled GRG's contract testified that he never heard anyone refer to RHJ as a replacement contractor. The agenda item by which the Board approved the addition says it is "to supplement" the JOC program.

5

told Ramirez that GRG would need to hire Clay as Marshall's "bag lady" in order to protect its JOC business.[5] GRG suggests that Ramirez's expression of disapproval to Aguirre was the triggering event for the decrease in GRG's JOC assignments.

In the February before the election, FBM paid for Marshall to attend the Super Bowl in Tampa, Florida. Medford admitted on tape that he had given Marshall approximately $150,000 since 2008. When Marshall faced a reelection contest in autumn 2009, the owners of RHJ and FBM donated to Marshall's campaign, in amounts totaling over $50,000. GRG did not contribute to Marshall's reelection campaign or otherwise support him, but there is no indication that Marshall or anyone else asked GRG or Ramirez to do so.

Also in August 2009, a District internal auditor noticed the non-recommended vendors on the Board of Trustees meeting agenda. He investigated the 2008 procurement process, concluding that HISD administrators failed to follow proper procedure and that the final JOC configuration did not provide the best value for the District. His report recommended voiding the contracts for noncompliance with state law. GRG attacks this report as a "smokescreen to enable Marshall and allied board members to steer more of the JOC work to his favored contractors." GRG asserts that an independent agency gave HISD's auditors low marks in a general review, and that the audit did not result in changes to future RFPs.[6]

---

[5] When asked whether he was involved in bribery schemes involving Marshall, Aguirre invoked his Fifth Amendment right against self-incrimination.

[6] GRG identifies no specific defects within the report, the purpose of which was to urge conformity to established procedures, not to change them.

No. 13-20753

In January 2010, based on the auditor's report, the District's Inspector General brought the 2008 noncompliance to the Board's attention and intimated that the conduct might be criminal. Presumably because the initial contract terms for the 2008 JOC vendors were at an end, the business administrator recommended rebidding the entire JOC program. Just a few days before the meeting at which the Board was scheduled to vote on renewal of the JOC contracts, the new Superintendent Terry Grier removed the matter from the agenda. Superintendent Grier later called for Lindsay's resignation when Lindsay was unable to explain his conduct in the 2008 RFP. Because the Board did not renew any contracts, most of the 2008 JOC contracts expired by February 2010; RHJ's contract remained in force until October 1, 2010, since it started much later than the others. All vendors had to bid in the 2010 RFP if they wanted to continue to be part of the JOC program.

The 2010 RFP selection process evaluated vendors' bids according to a pre-established set of criteria that, as in the 2008 RFP, was mostly a function of price. This time, the selection committee recommended KBR, RHJ, FBM, and Jamail & Smith, the last of which had been a JOC participant since before the 2008 expansion RFP. RHJ rehired Clay two days after its selection. The committee did not recommend GRG, which ranked tenth out of thirteen bidders because as in the previous RFP, its work was not competitively priced. The Board approved the selection committee's slate of vendors. GRG alleges, not without dispute by the Appellees, that the ranking system and selection process were pretextual.

Ramirez and GRG sued in December 2010, alleging that their refusal to bribe Marshall harmed their business, both in the reduction in assignments under the 2008 JOC and in GRG's nonselection under the 2010 RFP. GRG brought an array of federal and state law claims against the various

7

No. 13-20753

defendants.  Against HISD, plaintiffs alleged 1) violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; 2) infringement of their First and Fourteenth Amendment rights (through 42 U.S.C. § 1983); and 3) state law claims for breach of contract, estoppel, and civil conspiracy.  Against Marshall and Clay (and their respective consulting companies),  GRG alleged the same RICO violations, in addition to tortious interference with prospective contract, tortious interference with existing contract, and civil conspiracy (but not the estoppel or breach of contract claims).  The vendor defendants were also named in the RICO and tortious interference claims.  Extensive discovery was conducted.

The District, Marshall, and Clay moved for summary judgment on all claims.  The District also moved to dismiss the RICO and state law tort claims under Fed. Rules of Civ. Pro. 12(b)(6) and 12(c).  The district court granted these motions in its Memorandum and Order of November 18, 2013.  The district court first dismissed the state law claims against Marshall as barred by the election of remedies provision of the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code § 101.106.  It then held that GRG was not a proper RICO plaintiff; that GRG could not make out any constitutional violations, even if it could overcome various immunity obstacles; and that HISD and Clay were entitled to summary judgment or dismissal on the state law claims.  The district court dismissed the civil conspiracy charges because it had resolved the underlying tort claims, leaving no illegal conduct for a conspiracy.  After additional briefing, the district court granted summary judgment for the vendor defendants.  Final judgment was entered on December 13, 2013.  GRG timely appealed.

8

No. 13-20753

## STANDARDS OF REVIEW

The district court dismissed the state law claims against Marshall under Fed. R. Civ. Pro. 12(b)(6) and 12(c).  We review both types of motion de novo. *Jebaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 318 (5th Cir. 2009).  "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts 'to state a claim to relief that is plausible on its face.'"  *Bustos v. Martini Club Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)).

The district court disposed of the other claims on summary judgment.  "This court reviews the district court's grant of summary judgment de novo, applying the same standards as the district court."  *Depree v. Saunders*, 588 F.3d 282, 286 (5th Cir. 2009).  "Summary judgment is proper when no issue of material fact exists and the moving party is entitled to judgment as a matter of law."  *Cronn v. Buffington*, 150 F.3d 538, 541 (5th Cir. 1998).  "The standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the record evidence before the court."  *James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).

For Rule 12 and summary judgment alike, we view the facts and inferences in the light most favorable to the non-movant.  *Cronn*, 150 F.3d at 541; *Jebaco*, 587 F.3d at 318.

No. 13-20753

## DISCUSSION

In this appeal, Appellants challenge the district court's adverse judgment on all but one of their claims.[7] We address each cause of action in turn.

### I.     Racketeer Influenced and Corrupt Organizations Act

GRG sued all defendants under §§ 1962(c) and (d) of RICO, which prohibit, respectively, participation in a racketeering enterprise or conspiring to do the same.  In the district court, HISD objected that it was not a proper RICO defendant because as a municipal corporation it cannot form the *mens rea* of any of RICO's predicate offenses and is not susceptible to RICO's treble damages, which the District characterizes as "punitive."     Several other arguments were raised by HISD and other defendants, but the court found instead that GRG failed to assert or prove a cognizable RICO claim.  We disagree in part.  Our precedent requires a RICO plaintiff to show a "conclusive financial loss" and not harm to "mere expectancy" or "intangible" interests.  *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) (per curiam).  GRG has created a genuine issue of material fact on this issue.  Appellants may not, however, sue HISD for RICO violations, because the District is immune from treble damages.

### A. Ramirez and GRG as Plaintiffs

#### *1. The Standard*

RICO's civil provision creates a cause of action for "any person injured in his business or property by reason of a violation" of any of the statute's prohibited activities.  18 U.S.C. § 1964.  At issue here is the injury requirement.  The plaintiff's injury must be "conclusive" and cannot be "speculative."  *In re*

---

[7] GRG has not briefed and has therefore waived its claim for tortious interference with an existing contract.

No. 13-20753

*Taxable Mun. Bond Sec. Litig.*, 51 F3d 518, 523 (5th Cir. 1995). "Injury to mere expectancy interests or to an 'intangible property interest' is not sufficient to confer RICO standing." *Pinnacle Brands,* 138 F.3d at 607 (quoting *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d at 523).[8] The district court held that GRG's alleged injuries were uncertain and intangible because JOC job assignments and contract renewal were at the sole discretion of HISD. "Thus," the district court concluded, "any injury can only be the loss of an expectation interest and therefore speculative[.]"

Appellants contend that they were not required to demonstrate legal entitlement to JOC assignments or job orders, but only the *fact* of loss. That is, although HISD *could* stop assigning GRG jobs and end the business relationships, it *would* not have done so but for the alleged corruption. The district court appears to have interpreted GRG as showing only that HISD *might* have continued favoring GRG.

GRG is correct that a RICO plaintiff need not demonstrate legal entitlement, a point the Supreme Court made clear in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 128 S. Ct. 2131 (2008). The plaintiffs in *Bridge* were "regular participants in Cook County's tax sales[,]" in which bids often ended in a tie. *Id.* at 643, 128 S. Ct. at 2135. The county would then allocate the auctioned property on a rotational basis. *Id.* at 642, 128 S. Ct. at 2135. In order to make this process fair, each bidder was permitted only one simultaneous bid. *Id.* at 643, 128 S. Ct. at 2135. The plaintiffs alleged that a

---

[8] Following *Pinnacle Brands*, 138 F.3d at 606, the district court referred to this as "RICO Act standing." Although whether a legislative enactment authorizes a plaintiff to sue is sometimes referred to as "statutory standing," courts should avoid using that term. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387-88 & n.4 (2014) ("statutory standing" is a misleading label "since 'the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction'") (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642-43, 122 S. Ct. 1753, 1758 (2002)).

11

competing corporate bidder had arranged for false-flag bidders to channel additional allocations. *Id.* The *Bridge* plaintiffs had no legal entitlement to the subject matter of the auction. Nevertheless, the Supreme Court held that "[a]s a result of petitioners' fraud, respondents lost valuable liens they otherwise would have been awarded." *Id.* at 649, 128 S. Ct. at 2139. Because the *fact* of loss was certain, the plaintiffs could state a RICO claim.

Although the vagueness of terms like "expectancy" may have created some confusion, the context of our cases makes clear that the test is a factual one. In *Pinnacle Brands*, for instance, plaintiffs complained that the random inclusion of valuable "chase" cards in packs of baseball cards constituted "illegal gambling." 138 F.3d at 605. This court held that the plaintiffs could not show injury under RICO because they suffered no harm to a property interest; the card packs they bought were exactly what they bargained for. *Id.* at 607. *Pinnacle Brands* thus stands for the unremarkable proposition that a RICO plaintiff must demonstrate harm. The court's rejection of "mere expectancy interests" appears to have been directed at the notion that the plaintiff was injured by not having any luck in drawing a chase card. *See id.* That is, damage to a plaintiff's subjective expectations cannot form the basis of a RICO claim.

Likewise, in *In re Taxable Municipal Bond Securities Litigation*, the plaintiff (for himself and others similarly situated) claimed that corruption in a state-authorized municipal bond program injured certain farmers and ranchers who might have applied for loans under that program. 51 F.3d at 521-22. The loans under the program were loans of last resort, unavailable to those who could obtain other credit. *Id.* at 522. At least some of the farmers and ranchers had pursued and secured other loans with higher interest rates, which disqualified them for loans under the bond program. *Id.* The court held

No. 13-20753

that the farmers and ranchers "have suffered no injury from not receiving what they were ineligible to receive." *Id.* at 522. The court further held that the plaintiff had not demonstrated detrimental reliance, and that a lost opportunity to obtain a loan was too speculative. *Id.* at 522-523. Importantly, the plaintiff "ha[d] not alleged lost profits" or "that [the farmers and ranchers] ha[d] ever lost money as a result of the RICO scheme." *Id.* at 523. GRG alleges both. *Accord Tel-Instrument Elecs. Corp. v. Teledyne Indus., Inc.*, No. 90-1549, 1991 WL 87194 (4th Cir. May 28, 1991).[9]

The rule that emerges from these cases is that loss of a legal entitlement is sufficient but not invariably necessary to sustain a RICO claim. A plaintiff need not show that the other party *would have been obliged* to confer a benefit, only that the other party *would have conferred* the benefit. That HISD retained discretion to award fewer contracts, or no contracts at all, does not prohibit GRG from demonstrating that but for corruption, it would have continued to receive awards.

*2. The Evidence*

The standard now clarified, it remains to determine whether GRG has marshaled competent summary judgment evidence that its business was injured. The proof covers two periods of time, differentiated by GRG's status as a JOC contractor in 2009 and its subsequent failure to be chosen in the 2010 RFP process.

The district court acknowledged that evidence of factual loss might be sufficient, but found that GRG had not met this burden with respect to the

---

[9] Marshall cites this case for the proposition that "the denial of a government contract that plaintiff expected to receive, but for a competitor's alleged bribery of public officials, did not give rise to a cognizable RICO injury." What he fails to mention in his brief is that our sister court explicitly found that the plaintiff "would not have been awarded the [government] contract regardless." *Id.* at *2.

13

contract renewal.  GRG points to evidence that several Board members and a high-level administrator led Ramirez to believe that GRG's contract was on the verge of renewal.  As the district court noted, "[t]hese assurances [] were made before it was revealed to the HISD Board's audit committee that the same high-level administrator had bypassed the JOC contract procurement process unilaterally to award GRG with a contract in the first place."  GRG challenges that audit of the 2008 RFP as improperly motivated, but does not undermine the fact that the initial RFP was tainted nor does it allege that re-bidding the program was the wrong course of action.  GRG also faults the District's decision to select only four JOC vendors.  Even viewed in the light most favorable to GRG, however, none of this evidence shows that GRG would have been chosen in the 2010 RFP but for corruption.  Indeed, GRG's tenth-place ranking was so low that even if HISD had selected seven vendors and eliminated the vendor defendants, GRG still would not have been selected.[10]  In short, GRG has not adduced sufficient evidence to overcome summary judgment as to its nonselection in the 2010 RFP.

The sudden decline in JOC assignments in 2009, however, is another matter.  The District assigned GRG more work than any other contractor in the initial honeymoon period of the 2009 JOC program, and GRG won 42 of the 64 projects it "bid on" in 2009.  The confluence of events in August 2009—Superintendent Saavedra's testimony that his resignation was driven by his dispute with Marshall, RHJ's latter-day and questionable addition to the JOC

---

[10] After oral argument, Appellants called to our attention an internal audit HISD released on March 10, 2015.  While it may be true that "this report contradicts HISD's position in this case that their re-bid of JOC contracts cleaned up the demonstrated favoritism shown in 2008," GRG still does not challenge the facts that the 2010 re-bid was an appropriate response, or that GRG would not have been selected.

No. 13-20753

program, the drop-off in assignments to GRG—would allow a jury to infer that undue influence on and by Marshall harmed GRG's business.

Appellees offer plausible explanations why GRG's assignments dropped off, but none of these positively displaces the possible inference of corrupt influence. For example, vendors not alleged to have bribed Marshall continued to receive work after RHJ entered the picture. But GRG has produced evidence suggesting that Marshall's preferred vendor RHJ was displacing GRG after Ramirez spurned Marshall. Further, Appellees' expert noted that if GRG had continued to receive work at the same rate as it did the first two months, it would have been awarded over 100% of all JOC expenditures. But the drop off in total JOC volume may itself have been part of the alleged scheme. These are matters for the factfinder. We hold only that the evidence creates a fact issue as to the cause of the loss of GRG's JOC assignments.

Appellees urge many other grounds for affirming summary judgment on the RICO claims. "Although this court may decide a case on any ground that was presented to the trial court, we are not required to do so." *Breaux v. Dilsaver*, 254 F.3d 533, 538 (5th Cir. 2001). Because the issues require consideration of a voluminous record, "we decline to decide these complex issues as they are better addressed by the district court in the first instance." *Lone Star Nat'l Bank, N.A. v. Heartland Payment Sys., Inc.*, 729 F.3d 421, 427 (5th Cir. 2013).[11]

---

[11] By noting two particular issues that will be pertinent on remand, we do not presume to eliminate others raised by the Appellees. First, RICO claims require showing that the unlawful behavior proximately caused the plaintiff's injuries. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S. Ct. 1311, 1317 (1992). A threat to a finding of proximate cause here may lie in HISD's use of third-party project managers to administer its JOC assignments. The factfinder will have to determine whether GRG's injury "flows" from the RICO violations. *Khurana v. Innovative Health Care Sys., Inc.*, 130 F.3d 143, 150 (5th Cir. 1997), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494, 120 S. Ct. 1608 (2000). Second, the permissible scope and extent of damages is also a matter for the district court to determine on remand. GRG's expert estimates the company lost 18 jobs—JOC assignments

15

No. 13-20753

## B. HISD as a Defendant

HISD contends that school districts are not proper RICO defendants for two reasons. First, RICO requires demonstrating an underlying criminal act, which entails a *mens rea* requirement that a governmental entity cannot form. *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404 (9th Cir. 1991); *see also Pedrina v. Chun*, 97 F.3d 1296, 1300 (9th Cir. 1996) (reaffirming *Lancaster*).[12]    Second, municipal entities enjoy common law immunity from punitive damages, and, whatever else it is, RICO's treble-damages provision is at least partially punitive. *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 908 (3d Cir. 1991). These reasons have proven persuasive to other courts.[13] We agree with these holdings.

---

GRG would have received but for Marshall's improper influence—totaling $177,307. Based on the same data, a defense expert calculated the range of damages between $16,776.76 and $145,032.96. The defendants also challenge the reliability and thus admissibility of GRG's expert report.

[12] Several district courts in this circuit have also recognized "strong authority that governmental entities, such as counties or government agencies, cannot be proper RICO defendants." *Dale v. Mo. Governor Jay Nixon's Office*, No. CIV.A. C-11-114, 2011 WL 1810321, at *3 (S.D. Tex. May 10, 2011); *see also Nationwide Pub. Ins. Adjusters Inc. v. Edcouch-Elsa I.S.D.*, 913 F. Supp. 2d 305, 308 (S.D. Tex. 2012); *Dammon v. Folse*, 846 F. Supp. 36, 38 (E.D. La. 1994); *La. Power & Light Co. v. United Gas Pipe Line Co.*, 642 F. Supp. 781, 806 (E.D. La. 1986).

[13] Either of these theories—the inability to form a *mens rea* or immunity from punitive damages—might suffice to remove HISD from RICO's ambit in this case. There are also sound policy reasons for this conclusion:

> [T]he . . . theories for refusing to hold a municipal entity liable under RICO are not mutually exclusive—indeed, it can be said that they are two sides of the same concept. In an abstract but doctrinal sense, a corporation in and of itself cannot form *mens rea.* Similarly, a corporation, that is, the institutional construct itself, cannot be deterred; deterrence can only be achieved by targeting the behavior of the people who determine corporate conduct. Thus, if punitive damages would not operate to encourage innocent and essentially powerless taxpayers to prevent RICO's condemned activity by municipal officials, short of the election process, it would seem inappropriate to hold the municipal corporation liable.

*Dammon*, 846 F. Supp. at 38.

16

No. 13-20753

A particularly good reason for rejecting governmental RICO liability stems from judicial reluctance to impose punitive damages on the public fisc. The Supreme Court has held that a municipality's liability for § 1983 damages does not thereby subject it to punitive damages, from which government entities were historically immune. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263, 101 S. Ct. 2748, 2758 (1981). *City of Newport* emphasized that because a public entity itself "can have no malice independent of the malice of its officials," 453 U.S. at 267, 101 S. Ct. at 2760, punishment by punitive damages would be inequitably assessed against the public. Moreover, "the deterrence rationale of § 1983 does not justify making punitive damages available against municipalities." *Id.* at 268, 101 S. Ct. at 2160.[14]

*City of Newport* held that, to overcome municipal immunity from punitive damages, Congress must clearly express its intention. *Id.* at 263, 101 S. Ct. at 2749. No such clear intent to overcome governmental immunity appears in the RICO provision for treble damages.

GRG, however, fastens hope on the Supreme Court's ambiguity about treble damages, "which have a compensatory side, serving remedial purposes in addition to punitive objectives." *Cook Cnty., Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 130, 123 S. Ct. 1239, 1246 (2003). The Supreme Court locates "different statutory treble-damages provisions on different points along the spectrum between purely compensatory and strictly punitive awards." *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 405, 123 S. Ct. 1531, 1535

---

[14] When the Supreme Court held that municipal entities were liable under federal antitrust law, it "understandably [left] open the question whether municipalities may be liable for treble damages[.]" *Cmty. Commc'ns Co. v. City of Boulder, Colo.*, 455 U.S. 40, 65, 102 S. Ct. 835, 848 (1982) (Rehnquist, J., dissenting). Before there was occasion for the high court to resolve that question, Congress exempted governmental units from all monetary damages. Local Government Antitrust Act of 1984, Pub. L. No. 98-544, 98 Stat. 2750 (1984), *codified at* 15 U.S.C. §§ 34-36

No. 13-20753

(2003). Treble damages provisions designedly go well beyond the amount of actual harm, but the Supreme Court has "repeatedly acknowledged that the treble-damages provision contained in RICO itself is remedial in nature." *PacifiCare*, 538 U.S. at 406, 123 S. Ct. at 1535.

The Court's ambivalence about punitive damages complicates analysis here, but we believe *PacifiCare* cannot salvage a claim against HISD. First, the Supreme Court's characterization of RICO treble damages as "remedial" in *PacifiCare* cannot substitute for an express Congressional abrogation of municipal immunity from treble damages, which, whatever the characterization, exceed actual provable damages. To hold otherwise would mock *City of Newport*. Second, nothing in *PacifiCare* contravenes the Court's earlier holdings that treble-damages provisions serve both compensatory and punitive functions. *See Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 240, 107 S. Ct. 2332, 2345 (1987); *accord Genty*, 937 F. 2d at 910 ("there is convincing authority that Congress authorized civil RICO's powerful treble damages provision to serve a punitive purpose").[15] Third, the narrow question posed in *PacifiCare* was whether an arbitration agreement's ban on punitive damages included RICO treble damages. The Court refused to interpret the private parties' agreement, holding that threshold duty for an arbitrator. *PacifiCare* has no bearing on the liability of governmental entity defendants for treble damages under RICO.

For these reasons, we conclude that GRG cannot proceed against HISD under RICO's mandatory treble damage provision. Because Congress wrote no

---

[15] Albeit in non-precedential opinions, the Third Circuit has continued to apply *Genty* since *PacifiCare* was decided. *Tengood v. City of Philadelphia*, 529 F. App'x 204, 209 n.4 (3d Cir. 2013) (unpublished) (rejecting argument that *PacifiCare* abrogated *Genty*); *Heinemeyer v. Twp. of Scotch Plains*, 198 F. App'x 254, 256 (3d Cir. 2006); *Kadonsky v. New Jersey*, 188 F. App'x 81, 85 (3d Cir. 2006). *See also Cranberry Promenade, Inc. v. Cranberry Twp.*, No. CIV. A. 09-1242, 2010 WL 653915, at *4 (W.D. Pa. Feb. 22, 2010).

No. 13-20753

single-damage alternative, and we lack power to revise federal statutes, Appellants fail to state a cognizable RICO claim against HISD. *See Cullen v. Margiotta*, 811 F.2d 698, 713 (2d Cir. 1987) ("civil RICO requires that a successful plaintiff be awarded treble damages").

## II.    State Law Claims

### A. Breach of Contract and Estoppel Theories

GRG appeals the district court's summary judgment rejecting its state law claims against HISD for breach of contract and estoppel. GRG's breach of contract argument relies on an implied duty of good faith, which, as the district court noted, Texas law rejects except in the context of special relationships. *See Hall v. Resolution Trust Corp.*, 958 F.2d 75, 79 (5th Cir. 1992); *see also City of Midland v. O'Bryant*, 18 S.W.3d 209, 215 (Tex. 2000). The case that GRG cites to the contrary is inapposite, as the court relied expressly on the Texas Uniform Commercial Code, which imposes a duty of good faith in contracts for sales of goods, a condition plainly not met here. *See Mailing & Shipping Sys., Inc., v. Neopost USA, Inc.*, 937 F. Supp. 2d 879 (W.D. Tex. 2013). Indeed, *Neopost* admonished that there is no general duty of good faith in contracts in Texas. *Id.* at 889.

GRG also argues that "HISD breached its promise to GRG to permit GRG to *seek* JOC projects[.]" However, it cites neither a contractual provision nor other evidence of a promise. Consequently, GRG identifies no obligation that HISD failed to perform.[16]

GRG's promissory estoppel and quasi estoppel claims fare no better. The district court held that the promissory estoppel claim failed because the JOC contract covered the subjects of dispute, and that the quasi estoppel claim

---

[16] HISD urges several grounds to reject the contract claim other than those on which the district court relied. We need not and do not address these arguments.

19

failed because GRG did not create a genuine, material fact issue on the elements of that claim. Both of these holdings are correct.

Promissory estoppel "may be asserted by a plaintiff as an affirmative ground for relief." *Fertic v. Spencer*, 247 S.W.3d 242, 250 (Tex. App. 2007). To succeed on a promissory estoppel cause of action, a plaintiff must show: "(1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983). This cause of action, however, "presumes no contract exists[.]" *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002). "If . . . a valid contract between the parties covers the alleged promise, the plaintiff cannot recover for the promise under promissory estoppel." *Fertic*, 247 S.W.3d at 250. GRG's JOC contract here covered both the terms for the assignment of JOC work and the parties' rights in renewal. By its terms, the contract did not oblige HISD to assign JOC work, and the contract was renewable for successive years at HISD's sole discretion. Promissory estoppel is utterly displaced.[17]

Quasi estoppel, on the other hand, is not a freestanding cause of action but a procedural device or affirmative defense. *See Deutsche Bank Nat'l Trust Co. v. Stockdick Land Co.*, 367 S.W.3d 308, 311 (Tex. App. 2012). "Unlike equitable estoppel, quasi estoppel requires no showing of a false representation or detrimental reliance" but describes "certain legal bars, such as ratification, election, acquiescence or acceptance of benefits." *Steubner Realty 19, Ltd. v. Cravens Rd. 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App. 1991) (citing 31 C.J.S.

---

[17] GRG argues that the district court dismissed its estoppel claims "on the basis that GRG had a contract with HISD. But if the Court holds that no contract claim is stated, it should necessarily reinstate GRG's estoppel and quasi-estoppel claims." However, it is the existence of a *contract* that makes estoppel inappropriate, not the viability of any contract *claim*. Further, GRG pressed only quasi-estoppel in its reply brief.

No. 13-20753

*Estoppel* § 107 (1964)).  "This concept was developed to prevent a party from retaining a benefit by asserting a position to the disadvantage of another and then asserting a right which is inconsistent with that previous position." *Stimpson v. Plano Indep. Sch. Dist.*, 743 S.W.2d 944, 946 (Tex. App. 1987, writ denied).

GRG cannot prevail on quasi-estoppel either.  Quasi-estoppel "requires (1) a previous action and (2) a subsequent inconsistent action which is thereby sought to be estopped."  *Mulvey v. Mobil Producing Tex. & N.M Inc.*, 147 S.W.3d 594, 607 (Tex. App. 2004).  GRG argues that HISD should be "estopped to deny GRG's rights consistent with the parties' contractual relationships" and it accurately recites the elements of quasi-estoppel.  GRG does not, however, identify HISD's prior inconsistent action or the alleged benefit that it received at GRG's expense.  Its reply brief refers to "the promise relevant to the quasi-estoppel claim," but, as just discussed, quasi-estoppel needs no promise.  The district court found that "HISD did not take inconsistent positions[;] it merely acted according to the JOC contract."  Even if GRG's expectations were defeated by a bribery scheme, HISD's contract is not inconsistent with its actions regarding GRG.[18]

---

[18] In affirming these conclusions, we, like the district court, reserve judgment on whether public entities like HISD can be held liable at all under theories of estoppel.  Texas law generally immunizes municipalities from estoppel for governmental (as opposed to proprietary) functions, but the decisions seem to be split over whether a school district ever exercises proprietary functions.  *Compare S.W. ex rel. A.W. v. Arlington Indep. Sch. Dist.*, 435 S.W.3d 414, 421 & n.10 (Tex. App. 2014), *with Galveston Indep. Sch. Dist. v. Clear Lake Rehab. Hosp., L.L.C.*, 324 S.W.3d 802, 809 (Tex. App. 2010).  And while Texas courts have contemplated exceptions in certain extreme cases, *see Bowman v. Lumberton Indep. Sch. Dist.*, 801 S.W.2d 883, 888 (Tex. 1990); *City of Hutchins v. Prasifka*, 450 S.W.2d 829, 835-36 (Tex. 1970), we decline to explore the scope of these exceptions except to note that the cases address estoppel to deny agency, normally in the employment context.  *See, e.g., Hudspeth v. Chapel Hill I.S.D.*, No. 03-06-00243-CV, 2007 WL 1647818, at *4 (Tex. App. June 8, 2007); *La Villa Indep. Sch. Dist. v. Gomez Garza Design, Inc.*, 79 S.W.3d 217, 221 (Tex. App. 2002) (finding agency authority by estoppel); *Bowman*, 801 S.W.2d at 888.  It is unhelpful to talk about "estoppel" *simpliciter* when the different types of estoppel implicate different analyses.

21

## B. Tortious Interference with Prospective Business Relations

GRG brought tortious interference with prospective business relations claims against Marshall, Clay, and the vendor defendants and appeals the district court's rejection of those claims. We hold, contrary to the district court, that Marshall is not entitled to dismissal on state law grounds, nor is summary judgment appropriate for these defendants.

### 1. Election of Remedies for Claims Against Marshall

Marshall contends that he is immune from GRG's state law claims for tor tortious interference and conspiracy for two reasons. First, he argues that (a) the Texas Tort Claims Act ("TTCA") requires an election of remedies where a plaintiff has sued both a governmental entity and its employee and (b) that he is an "employee" of HISD under a statutory definition, Tex. Educ. Code § 22.051(a)(5), and therefore falls within the protection of the election of remedies provision of the TTCA. Second, Marshall argues that he is separately entitled to professional immunity under the Texas Education Code § 22.0511. The district court granted summary judgment in Marshall's favor on the first basis. We disagree with that conclusion and also find Marshall ineligible for the professional immunity provision.

The TTCA waives the state's immunity from suit in certain circumstances. Importantly for present purposes, the TTCA also covers all tort theories that may be alleged against a governmental entity whether or not it waives that immunity. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 658 (Tex. 2008). Further, "[i]f a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Tex. Civ. Prac. & Rem. Code § 101.106(e). The state supreme court interpreted this language to mean that "if a plaintiff brings virtually any state common

law tort claim against both a governmental unit and its employees, § 101.106(e) will allow the employee defendants to be dismissed if the governmental unit so moves." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 463 (citing *Garcia*, 253 S.W.3d at 658). In *Bustos*, this court held that where state law claims against the municipality based on negligent hiring and supervision were joined with claims against police officer defendants for excessive force, the claims against the city were "rooted in the same alleged common law violations." *Id.* at 464. Accordingly, the court was bound to grant the city's motion to dismiss the officers pursuant to § 101.106(e).

In this case, the district court assumed that Marshall was an HISD employee and, based on TTCA § 101.106(e) and *Bustos*, granted HISD's motion to dismiss both state law conspiracy claims filed against HISD and Marshall and the tortious interference claims brought against Marshall alone. The court concluded that the tortious interference claims were "rooted in the same alleged common law violations" as the global conspiracy claims. Why HISD would have wanted to shield Marshall from GRG's suit in this fashion, given the seriousness of the allegations and the state of proof, is unclear. Nevertheless, in this posture it becomes critical to determine whether Marshall was an "employee" of HISD who could be statutorily shielded. Because we conclude that he was not, there is no need to reach the question whether *Bustos* compels the dismissal of claims brought against Marshall but not HISD.

The TTCA defines an employee as "a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority" but excludes "a person who performs tasks the details of which the governmental unit does not have the legal right to control." Tex. Civ. Prac. & Rem. Code § 101.001(2). Marshall, an elected school board trustee, was neither

## No. 13-20753

in HISD's paid service nor did the District have any right to control him. He is not an employee under the TTCA.

To overcome this deficiency, Marshall asserts that he was an "employee" pursuant to the recent decision of the Texas Supreme Court in *Franka v. Velasquez*, 332 S.W.3d 367 (Tex. 2011). One defendant in *Franka* was a medical resident who did not fit TTCA's definition of employee, because she "was not both paid by and subject to the legal control of the same governmental unit[.]" *Franka*, 332 S.W.3d at 373. The court deemed her an employee under the TTCA, however, pursuant to a provision of the Texas Health and Safety Code, which designated medical residents as employees "for purposes of determining liability[.]" *Id.* at 374. Marshall analogizes his position to that of the medical resident in *Franka*. Provisions of the Texas Education Code define a school board trustee as an employee, Tex. Educ. Code § 22.051,[19] and grant immunity to "employees" for "any act that is incident to or within the scope of the duties of the employee's position . . . and that involves the exercise of judgment or discretion[.]" Tex. Educ. Code § 22.0511(a). On the basis of this analogy, Marshall urges us to rely on the Education Code's definition of employee.

But even if some "employees" under these Education Code provisions might fall within the scope of *Franka*, Marshall does not. The same Education Code provision limits personal liability "for any act *that is incident to or within the scope of the duties* of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee[.]" Tex. Educ. Code § 22.0511 (emphasis added). Marshall is not alleged to have

---

[19] The statute defines a "professional employee of a school district" to include "a member of the board of trustees of an independent school district[.]" Tex. Educ. Code § 22.051(a)(5).

24

been acting "within the scope" of his duties. To the contrary, bribery and peddling influence are not within the scope of a trustee's duty. He was allegedly defiling his position and wholly outside the legitimate scope of a trustee's duties if he accepted bribes in exchange for advancing the interests of certain contractors. Marshall's rationalization that getting involved with contracting and procurement decisions is "minimally" within the scope of his duties, particularly when he served as HISD Board President in 2009, cannot stand against GRG's detailed evidence of the pay-to-play scheme. Marshall is not entitled to immunity under the TTCA or the Education Code.

*2. Tortious Interference with Prospective Business Relations*

Next to consider is whether summary judgment was appropriate on GRG's claim for tortious interference with prospective business relations against Marshall, the vendor defendants and Clay. GRG contends that there was a reasonable probability that it would have entered into additional contracts with HISD and that Marshall, Clay, and the vendor defendants "intentionally interfered with the relationship."

The Texas Supreme Court has recently defined the elements of tortious interference with prospective business relations. The common law cause requires that

> (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). The second element in this list—the requisite mental state—was the

No. 13-20753

deciding factor for the district court, which found that any bribery on the part of competing vendors did not have as its object the interference with GRG's status as a JOC contractor.  The district court relied on *Bradford v. Vento*, in which the Texas Supreme Court adopted the explanation of the Second Restatement of Torts that when a defendant "had no desire to effectuate the interference by his action but knew that it would be a mere incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper."  48 S.W.3d 749, 757 (quoting RESTATEMENT (SECOND) OF TORTS § 766B cmt. d (1979)).

*Bradford* is distinguishable on its facts.  The plaintiff in *Bradford* claimed he had bought a particular store from its previous owner.  The defendant mall administrator had allegedly interfered with the plaintiff's sales by stating, in response to a police inquiry, that the previous owner still owned the store.  *Bradford*, 48 S.W.3d at 754-55.  The Texas Supreme Court found that "the interference was at most only an incidental result of Bradford's legitimate conduct."  *Id.* at 758.  *Bradford* dealt with statements made in good faith, whereas these defendants' actions hardly occurred in good faith.

GRG bolsters its argument by citing *Strickland v. Joeris*, an unpublished Texas court of appeals case.  No. 04-11-00626-CV, 2012 WL 6013423 (Tex. App. Nov. 30, 2012) (mem. op.) (unpublished).  The plaintiff in *Strickland* contended he was fired because of a dispute he had with one of the firm's largest clients over a transaction unrelated to the firm's business.  Shortly after the dispute, the client called the firm and complained about the employee.  The plaintiff introduced evidence that the client "made it clear" that the plaintiff's dispute "could possibly jeopardize all current and future work."  *Id.* at *4.  The court held that this was sufficient to create a triable fact issue as to whether the client intended to jeopardize the employee's future with the firm.  *Id.*  GRG

26

No. 13-20753

contends that the evidence here likewise supports the inference that its competitors "instructed Marshall to get rid of GRG[.]"

In *Strickland*, the defendant actually made statements to a party in the business relationship about the plaintiff, and circumstantial evidence strongly supported an inference that the statement was designed to harm the plaintiff.[20]   In contrast, there is in this case no direct evidence of communications between any vendor defendant and any HISD official on the subject of GRG.  The nature of the alleged bribery scheme, however, was to fix the contracting process in favor of the vendor defendants.  Where only a limited number of JOC contractors would be selected, all of the participants in the scheme "knew the interference was substantially certain to occur as a result of the conduct."  *See Coinmach Corp.*, 417 S.W.3d at 923.  This reasoning would apply to GRG's claim as regards the decrease in projects under the 2009 contract and the non-renewal of GRG's JOC contract in the 2010 RFP process.[21]  That this one element of the claim survives summary judgment does not, of course, resolve questions concerning the other elements on which the court did not rule.

## III.   Civil Conspiracy Claims

Our partial reinstatement of the RICO claim and the claim for interference with prospective business relations requires reinstatement of the

---

[20] *See also Lee v. Levi Strauss & Co.*, 897 S.W.2d 501 (Tex. App. 1995), in which a letter from the defendant led the plaintiff's employer to believe he had to fire the plaintiff. *Id.* at 504-05.

[21] Appellees strenuously contend that GRG's claim also fails for lack of evidence that it would have become a JOC contractor following the 2010 RFP.  This contention was not addressed by the district court, and we do not address it either.  Assessing the "likelihood" of "prospective business relations" under Texas law suggests different considerations than the RICO inquiry we discussed earlier herein, which is whether HISD "would have" entered into a 2010 JOC arrangement with GRG.

No. 13-20753

civil conspiracy claim against the defendants targeted thereby (except HISD) pending further developments on remand.

## IV.     Constitutional Claims

GRG and Ramirez brought equal protection, First Amendment, and due process claims under the Civil Rights Act, 42 U.S.C. § 1983 against HISD and Marshall.  The First Amendment claim fails for essentially the reasons stated by the district court: Appellants did not "speak" or intend to convey a particular message, and no one would have "reasonably apprehended" that they so intended, when they refused to pay bribes to Marshall.  *See Cabrol v. Town of Youngsville*, 106 F.3d 101, 108 (5th Cir. 1997).  The due process claim fares no better.   GRG identifies no constitutionally protected liberty or property interest.  *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 92 S. Ct. 2701 (1972).

GRG's equal protection claim also lacks support.[22]  The Equal Protection Clause forbids state actors from treating similarly situated individuals differently *for a discriminatory purpose* and without a rational basis.  GRG argues that the zero-sum nature of the JOC program meant that Marshall and HISD knew that favoring bribers would harm those who refused to bribe, and that a plaintiff must only "show that the decisionmakers were aware" of potential harm to disfavored individuals.  "'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296 (1979). The district court concluded that GRG failed to demonstrate that Marshall or HISD discriminated against GRG "because of" and not "in spite of" its refusal to pay bribes.  *See id.* (equal protection claim requires showing that "the

---

[22] At the outset, we reject HISD's unpalatable argument that there was no disparate treatment since all vendors were given an opportunity to bribe a trustee.

decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects"). Nothing in the record suggests that Marshall or any of his collaborators acted to harm non-bribers. *See SECSYS, LLC v. Vigil*, 666 F.3d 678, 687 (10th Cir. 2012) (rejecting equal protection claim arising out of pay-off scheme involving state contracts when harm was "at most a foreseen (but unintended) side effect"). That Marshall may have perverted HISD's procurement processes to cause HISD to discriminate *in favor of* RHJ and FBM is not sufficient to show that GRG was discriminated *against*. *See Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006) (rejecting equal protection claim when one vendor "was treated beneficially, but no party was discriminated against").

Further, an equal protection claim depends on either identifying a class, *Washington v. Davis*, 426 U.S. 229, 240 (1976), or showing that the aggrieved party is a "class of one," *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074 (2000). Ramirez does not claim that he was discriminated against on the basis of his membership in any particular class and therefore must rely on the class of one theory. However, the class-of-one rationale does not apply to "forms of state action . . . which by their nature involve discretionary decision-making based on a vast array of subjective, individualized assessments." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 603, 128 S. Ct. 2146, 2154 (2008). *Engquist* held that the discretionary-decision-making "principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id.* at 604, 128 S. Ct. at 2154; s*ee also Harris v. Quinn*, 134 S. Ct. 2618, 2653 (2014) ("the government has wider constitutional latitude when it is acting as employer

than as sovereign").  HISD calls our attention to the "obvious parallels between government employees and government contractors."  *Engquist* is not dispositive of GRG's class of one theory but cuts against it.  In any event, even if GRG's dealings with HISD fall within a class of one for equal protection purposes, the absence of discriminatory intent dooms its claim.

For the foregoing reasons, GRG cannot sustain its constitutional claims.[23]

## CONCLUSION

The district court commendably dealt with novel claims in this troubling case with a long and complex record.  Based on the foregoing discussion, we AFFIRM the judgment dismissing HISD from liability for RICO and federal constitutional violations and state law claims.  We AFFIRM the judgment dismissing Marshall from liability for constitutional violations.  We REVERSE and REMAND, for further proceedings consistent herewith, the summary judgment dismissing the RICO claims against the (non-HISD) Appellees insofar as they allege injury covering the remainder of the 2009 JOC contract period.   We REVERSE and REMAND for further proceedings consistent herewith the summary judgment dismissing the claim against the (non-HISD) Appellees for tortious interference with prospective business relations and the civil conspiracy claims.

**AFFIRMED IN PART, REVERSED and REMANDED IN PART.**

---

[23] We do not reach HISD's assertion that these § 1983 claims do not justify imposing municipal liability.